COMMONWEALTH *vs.* CITY OF ROXBURY

An information on Rev. Sts. *c.* 108, to recover lands below low water mark, and more than one hundred rods below high water mark, sufficiently describes the title of the Commonwealth by averring that it was " the owner in fee of all said channels, lands and flats."

An information on Rev. Sts. *c.* 108 against a town does not admit its title in fee in flats sought to be recovered, by describing them as situated in that town.

The Massachusetts Colony Charter conveyed to the grantees all public and private rights in the seashore between high and low water mark.

A grant of land by the colonial government before the ordinance of 1647 did not pass the soil of the seashore between high and low water mark, without express words.

The order of the general court of 1636, " that all the rest of the ground lying between Dorchester bounds and Boston bounds shall belong to the town of Roxbury, easterly of Charles River, (except the propriety of the aforesaid town, which they purchased of particular persons,) Roxbury not to extend above eight miles from their meeting-house," did not grant to the town of Roxbury the title to the flats lying between Boston bounds and Dorchester bounds, more than one hundred rods below high water mark.

An act establishing a mill corporation, with authority to exclude the tide waters from a portion of the flats of the Commonwealth, and to use it as a basin for the purposes of a mill power, does not release the title of the Commonwealth to such flats.

A committee appointed to settle the boundary between two towns, in their report, which was accepted by both towns, defined a line by bounds, courses and distances, and added, " Some deviations from the original or natural boundary and some exchanges of territory are involved; and consequently it is supposed that the sanction of the legislature will be necessary to render valid the arrangement agreed to." The legislature afterwards passed an act declaring that the lines thus defined " should constitute and be considered the boundary lines between the said towns, and the territory and jurisdiction on either side of said line as hereby established are accordingly confirmed to said towns respectively." *Held*, that neither the agreement of the towns nor the act of the legislature affected the title of the Commonwealth to the seashore within one of the towns.

Perambulations of the boundaries of towns by the selectmen are no evidence against the Commonwealth of the title to flats within those towns.

Cutting grass nearly every year on flats covered part of the time by the tide does not amount to disseisin.

A right of draining through land cannot be set up in defence to an information by the Commonwealth on the Rev. Sts. *c.* 108, to assert its title to the land.

The reference of a case by rule of court to an arbitrator to " award and determine the whole cause, including the law and the facts, but subject to the review and final adjudication of all matters of law in the cause by the court," does not make his award conclusive upon the question whether the terms of a grant from the general court, before the ordinance of 1647, passed the title to the soil between high and low water mark. And if the arbitrator reports all the facts with his award in favor of one party, the court may render judgment thereon for the other, without recommitting the award.

INFORMATION of intrusion, filed by the attorney general on the 4th of April 1855, under the Rev. Sts. *c.* 108, to recover a parcel of flats in the Back Bay in Roxbury, more than one hundred yards below the line of high water mark

The information averred that the Commonwealth on the 15tl of September 1852 " was, and before that time ever had been the owner in fee of all the lands, channels and flats situated in the Back Bay, in the city of Roxbury, in the county of Norfolk in said commonwealth, lying below the line of riparian proprie torship and southerly of the main dam and avenue of the Boston and Roxbury Mill Corporation ; and that said commonwealth now is the owner in fee of all said lands, channels and flat lying within the empty basin in said Back Bay, and within fourteen hundred feet southerly of said dam, and of all said lands, channels and flats within the full basin in said Back Bay ; " and " that the city of Roxbury did, on the said fifteenth day of September, and on divers other days within twenty years last past, as well before as after said fifteenth day of said September, and as well before as after said Roxbury was chartered as a city, unlawfully enter and intrude upon said lands, channels and flats, then and now so owned by said commonwealth, for the purpose of unlawfully holding the same against the Commonwealth." And thereupon the information prayed for a summons to the city of Roxbury to appear and answer to this information, " and that such further proceedings may be had in the premises as to law and justice may appertain." The information was afterwards amended by more particularly defining the flats claimed by the Commonwealth.

The city of Roxbury, and the town of West Roxbury, (which had been set off from Roxbury and incorporated as a separate town by *St.* 1851, *c.* 250,) severally appeared and pleaded " that they are not guilty of the intrusion wherewith they are charged in said information ; and that they did not enter and intrude upon said premises in manner and form as therein is declared ; " and filed specifications of the following grounds of defence :

1st. That the premises were not described with sufficient certainty in the information.

2d. That the city of Roxbury and the town of West Roxbury on the day of the suing out of this information and always afterwards owned the premises in fee simple as tenants in common, in the proportions of about five sevenths to said city

and two sevenths to said town. And the defendants gave notice that for their title they would rely among other things upon the following:

" A. The grant of said premises by the colonial and provincial charters and governments of the Massachusetts Bay to the town of Roxbury.

" B. The confirmation of the aforesaid grant by the Commonwealth of Massachusetts.

" C. The exclusion of the tide water from said empty basin, part of said premises, under authority granted by the Commonwealth of Massachusetts.

" D. The adverse possession of said premises by the said town of Roxbury and by the defendants, taking the crops and exercising ownership over the same, for more than twenty years, in good faith, claiming title, prior to the suing out of said information and prior to September 15th 1852, and prior to the 20th of May 1852.

" E. The incorporation of the town of West Roxbury aforesaid by the Commonwealth of Massachusetts, and the agreement made between said town and the defendants relative to said premises, prior to said information. The defendants will avail themselves of all their rights, waiving nothing.

" F. The natural drainage of a large part of the territory of said original town of Roxbury always has been, and now is, into said Back Bay, and through said channels thereof into Charles River; and these defendants now claim the same right and privilege of drainage, subject only to the lawful obstruction created by the erection of said milldam, which permanently cut off the natural ebb and flow of the tide from said lands, flats and channels of said bay in 1821, but left sluices for the discharge of said drainage, with the waters of Muddy River and Stony Brook, and other smaller streams, into said Charles River."

At February term 1857 this cause was, by rule of court, and with the concurrence of the commissioners on the Back Bay, acting under the authority of the resolve of 1852, *c.* 79, " referred to the arbitration of Hon. Marcus Morton, of Taunton, Massa

chusetts, aforesaid ; and the referee shall give reasonable notice
to the parties of the time and place of hearing; and the hearing
shall begin as soon after May 15th 1857 as conveniently may
be, and the award shall be returned into court as soon thereafter
as practicable ; and the pleadings.in the cause may be amended,
if need be, so as to embrace all the conflicting claims, rights and
interests of the parties, within the bounds described in the first
resolve of chapter 79 of the resolves of 1852, concerning Boston
Harbor and the Back Bay; and the referee may make all needful
views of the premises and all reasonable orders for the proper
hearing and determination of the cause ; and the referee shall
report all questions of law arising in the cause to the court for
revision and final adjudication ; meaning hereby that the referee
shall award and determine the whole cause, including the law
and the facts, but subject to the review and final adjudication
of all matters of law in the cause by the full court."

At the hearing before the arbitrator, the Commonwealth moved
to amend the information by inserting before the words " owner
in fee " the words " under and by virtue of the charter of the
Colony of Massachusetts Bay and the charter of the Province of
Massachusetts Bay, in New England, or one of them ; meaning
to state more fully thereby the nature of the title of the Com-
monwealth ; " by striking out everything relating to any claim of
land or flats in the full basin ; and by amending the description
of the other premises claimed.   The arbitrator at this term made
the following report :

" The referee appointed by the annexed rule, having duly
notified the parties, met them in the State House, on the twenty-
second day of June last, and from time to time between that
day and the twentieth of October last ; and having heard their
several pleas, allegations, proofs and arguments, and having
duly examined and considered the same, and having viewed
the premises, doth now make the following award and report :

" This is an information brought by the attorney general in
behalf of the Commonwealth, under the statute of 1836, chapter
108, for the purpose of recovering certain lands and flats in the
Back Bay, so called, alleged to be owned by the Commonwealth

Commonwealth *v.* City of Roxbury.

" The defendants' counsel objected to the sufficiency of the information under the statute, and contended that a prerogative title could not be given in evidence under it.

" The counsel for the Commonwealth offered several amendments, which were objected to by the defendants' counsel.

" But I overruled the objection, and held, that under the circumstances the amendments were admissible, and that under the information, as amended, it was competent for the Com monwealth to give any evidence of title which it might possess.

" The counsel for the Commonwealth contended that the title to the demanded premises, on the first settlement of the country, was vested in the Colony, and thence, by the acts of the several governments, passed through the Province to the Commonwealth.

" This position I adopted, and held that the fee still remained in the Commonwealth, unless its government, or that of one of its predecessors, had aliened it.

" The defendants' counsel then introduced an act of the general court of the Colony of Massachusetts, passed May 25, 1636, in these words : ' Ordered, that all the rest of the ground lying betwixt Dorchester bounds and Boston bounds shall belong to the town of Rocksbury, easterly of Charles River, (except the propriety of the aforesaid town, which they have purchased of particular persons,) Rocksbury not to extend above eight miles in length from their meeting-house.'

" The defendants' counsel contended that this was a grant in fee of all ' the ground ' described in it, and that the demanded premises were included in the description.

" I have examined the terms used in this order, considered the usual modes of erecting towns and making grants of land to them, the unsettled state of the country, and the consequent want of accurate knowledge of local objects ; and am of opinion that a very liberal rule of construction should be adopted in relation to the grants and other public acts of that day. I am therefore of opinion and decide, that this order was a grant in fee of all the land described in it ; that the description covers all the land lying between Dorchester and Boston, as the limits of

the two towns then existed, which had not before been granted to Roxbury ; that inasmuch as every part of the territory granted lay easterly of some parts of Charles River, and southerly of other parts of said river, I cannot believe that the introduction of the words ' easterly of Charles River,' if they apply to the granted new territory rather than the whole town, was intended to divide it, and to grant one part and reserve the other part of the territory, which was included in the general description of the whole. I am therefore of opinion and do decide, that the act of 1636, in the liberal and proper construction of the language used, operated as a grant, and vested in the then town of Roxbury the fee of the demanded premises.

" This view of the case seems to me decisive of its merits. and but for the terms of the rule and the agreement of the parties I should not deem it necessary or proper to proceed any further in my report. But these expressly require ' the referee to report all questions of law arising in the cause to the court for their revision and final adjudication.' But I am directed to award and determine the whole cause, including the law and the facts, subject to the review and final adjudication of all matters of law in the cause by the whole court.

" Gratefully relieved by this provision, I proceed to report all the points raised by the counsel on either side, without giving an opinion upon their materiality or relevancy.

" It was contended by the defendants' counsel, that the exclusion of the tide water from the empty basin, by virtue of the act incorporating the Boston and Roxbury Mill Corporation, passed June 14th 1814, and the subsequent acts of legislation touching that subject, vested in the adjoining owners all the land thus made bare, or at any rate operated as a relinquishment of all the rights of the Commonwealth, and barred it from making any claim to the same.

" But I was of opinion and held, that neither the act of 1814, and the proceeding under it, nor any other acts of the government, divested the Commonwealth of any right or title which it had or might have to the premises in litigation.

" The defendants' counsel contended that the demanded prem-

ises, being admitted by the allegations in the information to be within the bounds of Roxbury, were, by virtue of the original settlement of the town and the act of 1836, necessarily the property of the town.

" But as the premises might be within the jurisdictional limits of the town, and not its property, I was of opinion and held, that the allegation was not proof of title in Roxbury, nor did it preclude or estop the Commonwealth from setting up and maintaining any title it might have to the premises.

" The defendants' counsel further contended that the bounds between the two cities, agreed upon by Boston and Roxbury, in 1823, and afterwards, viz., in 1836, established and confirmed by the legislature, and from the time of said agreement till the commencement of this suit acquiesced in and recognized by every body, must be presumed and held to be the bounds established by the colonial act of 1636.

" On this point I had doubts.  But inasmuch as this line was agreed upon by parties who had no power to bind the Commonwealth, or in any way to affect its title, and inasmuch as the act of the Commonwealth in confirming and establishing this line may be supposed to look rather to jurisdictional bounds than to the title of the lands, and inasmuch as this was a conventional line, though intended to be based on the original line of 1636, yet avowedly departed from it in many particulars, I was of opinion and held, that though these several circumstances furnished strong evidence that the premises were included within the grant of 1636, yet they do not furnish conclusive evidence that such was the case.

" The defendants' counsel also contended that the act of 1836, chapter 37, by its true construction, not only establishes the jurisdictional bounds between Boston and Roxbury, but establishes the title to the land in question in Roxbury, so far at least as to preclude and estop the Commonwealth from setting up a claim to the premises.

" But I was of opinion, though it was strong evidence of the construction of the grant of 1636, which I have adopted, yet it was not of itself to establish a title in Roxbury, if they had none

before. But I held, that that establishment of this line was a valid substitution of the conventional line for the original line, so that if Roxbury established her title under the act of 1636 she will hold and recover up to this straight line instead of the original crooked line.

" Much evidence was introduced to show possession in Rox bury, and acquiescence in all others. All the evidence on this point is fully reported, and will be herewith presented to the court for their consideration. In my opinion it did not prove that continuous and exclusive possession of the whole premises which is necessary to establish a title by disseisin.

" The defendants, in their answer, set up a claim to a right of drainage in the natural channels running through the demanded premises.

" But I was of opinion and held, that this question did not properly arise, and could not be tried in this suit. I was also of opinion, no evidence was offered which could sustain the claim, even if it came properly before this reference.

" All the evidence offered on either side was admitted, subject to the opinion of the whole court on its admissibility and relevancy.

" Having duly considered the whole case, and all the several grounds taken and urged by the counsel on both sides, and given my opinion on the same as before stated, do now report and decide and award, that the defendants have established their title to the fee of the demanded premises as described in the attorney general's information, and therefore that the Commonwealth take nothing by its information aforesaid, and the costs be taxed according to law."

The arbitrator returned with his award a list of the charters, laws and records, principally relied on at the hearing, and a full report of the evidence introduced before him.

The maps used at the hearing were the following : " The South Part of New England as it is Planted this yeare 1634," in Wood's New England Prospect, London 1634, copied in Young's Mass. Chron. 389, and in 1 Palfrey's Hist. New England, 360. Des Barres Map of Boston Harbor, 1775

Commonwealth *v.* City of Roxbury.

Mather Withington's plan of Roxbury in 1794. Hale's Map of Boston in 1820. Maps of Boston, Roxbury, Dorchester, Brookline, Dedham and Cambridge, made under the resolve of 1829 *c.* 50. Shedd's Map of the Vicinity of Boston in 1853.

In the following plan, the shaded part denotes the flats in dispute, and the only modern lines are those of the Milldam and the boundary of Roxbury upon the flats. The other lines and bounds approximately represent the location of the grant of 1636 upon a scale of two and a half miles to the inch.

The following laws and records were referred to : The Colony Charter, granting territory, including the premises in question, to the Governor and Company of the Massachusetts Bay. 1 Mass. Col. Rec. 3.* Anc. Chart. 5. The orders made by the Company in England in 1629, and by the general court in 1638, for the allotment of lands in the Colony. 1 Mass. Col. Rec. 34, 39, 43, 64, 68, 363, 399, 405 ; 225, 240. Anc. Chart. 709–711. The order of the court of assistants in 1630, taxing Roxbury and other plantations for the support of military officers.† The early orders of the general court as to the making, surveying and recording of grants of lands, and the powers and

---

\* The references, when not stated to be to the original records, are to the edition printed for the Commonwealth.

† September 28th 1630. " It is ordered, that there shalbe collected and levied by distresse out of the severall plantations, for the maintenance of Mr. Patricke & Mr. Vnderhill, the some of 50*l.*, vizt: out of Charlton, 7*l.* ; Boston, 11*l.* ; Dorchester, 7*l.* ; Rocsbury, 5*l.* ; Waterton, 11*l.* ; Meadford, 3*l.* ; Salem, 3*l.* ; Wessagu cus, 2*l.* ; Natascett, 1*l.*" 1 Mass. Col. Rec. 77.

Commonwealth *v.* City of Roxbury.

bounds of towns, which are copied in the margin.\* The orders,

* April 1st 1634, affirmed March 4th 1634–5. Order for the survey and re-
cording by " the constable and four or more of the chief inhabitants of every
towne (to be chosen by all the free men there att some meeting there) with the
advice of some one or more of the next assistants," of all lands " improved or
enclosed or graunted by speciall order of the court." 1 Mass. Col. Rec. 116, 137.
Anc. Chart. 41.

May 14th 1634. " That none but the Generall Court hath power to rayse
moneys and taxes, and to dispose of lands, viz. to give and confirme proprietyes."
1 Mass. Col. Rec. 117.

September 3d 1634. Order for the pay of the " nyne comittees appoyncted to
sett out the bounds of townes." 1 Mass. Col. Rec. 127. [See Ib. 125.]

March 3d 1635–6. " Whereas particular townes have many things which con
cerne onely themselves and the ordering of their owne affaires, and disposeing of
businesses in their owne towne, it is therefore ordered, that the freemen of every
towne, or the major parte of them, shall onely have power to dispose of their
owne lands, and woods, with all the previlidges and appurtenances of the said
townes, to graunt lotts, and make such orders as may concerne the well ordering
of their owne townes, not repugnant to the lawes and orders here established by
the Generall Court ; as also to lay mulks and penaltyes for the breach of their
orders, and to levy and distreine the same, not exceeding the some of xxs. ;
also to chuse their own particular officers, as constables, surveyors for the high-
wayes, and the like ; and because much business is like to ensue to the constables
of severall townes, by reason they are to make distresses, and gather fynes, there-
fore that every towne shall have two constables, where there is neede, that soe
their office may not be a burthen unto them, and they may attend more carefully
upon the discharge of their office, for which they shalbe lyeable to give their
accompts to this court when they shalbe called thereunto." 1 Mass. Col. Rec.
172. Anc. Chart. 195.

September 9th 1639. " Item. To record all men's houses and lands, being
certified under the hands of the men of every towne deputed for the ordering of
their affaires." 1 Mass. Col. Rec. 276. Anc. Chart. 43.

June 3d 1641. " It is ordered, that every towne should sett out their bounds
within twelve months after their bounds are graunted." 1 Mass. Col. Rec. 319.

November 11th 1647. Ordered, " that every towne shall set out their bounds
within a twelve month after their bounds are granted, and that when their bounds
are once set out, once in three yeares, 3 or more persons of a towne, appointed by
the selectmen, shall appoint with the adjacent townes to go the bounds betwixt
their said townes and renew their marks, which marks shalbe a greate heape of
stones or a trench, of six foote long two foote broade, the most ancient towne to
give notice of the time and place of meeting for perambulation which shalbe in
the first or secor' month." 2 Mass. Col. Rec. 210. Anc. Chart. 53.

copied in the margin,* concerning the bounds of Boston, Rox-

* November 7th 1632. " Capt. Trask, Mr. Conant, William Cheesebrough and John Perkins are appointed by the court to sett downe the bounds betwixte Dorchester and Rocksbury. Ralfe Sprage is chosen umpire." 1 Mass. Col. Rec. 102.

March 4th 1632–3. " It is agreed, that the bounds formerly sett out betwixte Boston and Rocksbury shall continue, onely Rocksbury to enjoy the conveniency of the creeke neere thereunto." 1 Mass. Col. Rec. 103.

August 6th 1633. " It is agreed that there shalbe a sufficient cartbridge made in some convenient place over Muddy River, and another over Stony Ryver, to be done att the charge of Boston and Rocksbury." 1 Mass. Col. Rec. 107.

March 4th 1633–4. A committee " appoyncted to sett out the bounds betwixte Boston and Rocksbury, which is nowe in difference betwixte them." 1 Mass. Col. Rec. 113.

September 25th 1634. "It is ordered, that the ground aboute Muddy Ryver belonging to Boston, and used by the inhabitants thereof, shall hereafter belonge to Newe Towne, the wood and timber thereof groweinge and to be groweinge to be reserved to the inhabitants of Boston, provided, & it is the meaneing of the court, that if Mr. Hooker and the congregation nowe setled here shall remove hence, that then the aforesaid meadowe ground shall return to Waterton, and the ground att Muddy Ryver to Boston." 1 Mass. Col. Rec. 129, 130.

September 25th 1634. " It is ordered, that Boston shall have inlargement att Mount Woolliston and Rumney Marshe." 1 Mass. Col. Rec. 130.

March 4th 1634–5. " It is ordered, that the bounds of ground betwixte Newe Towne and Rocksbury, aboute Muddy Ryver, & soe upp into the country, shalbe sett out by Ensigne Jennison, before the nexte court of assistants, under the penalty of v*l*." 1 Mass. Col. Rec. 142.

April 7th 1635. Said Jennison's report that " the lyne betwixte Rocksbury and Newe Towne is layde out to run south west from Muddy Ryver, neere that place which is called Mr. Nowell's bridge, a tree being marked on foure sydes, and from the mouthe of the ryver to that place : the south side is for Rocksbury, and the north syde for Newe Towne." 1 Mass. Col. Rec. 144.

September 3d 1635. " It is ordered that there shalbe a plantation setled, about two myles above the falls of Charles Ryver, on the north east syde thereof, to have ground lyeing to it on both sydes the ryver, both upland and meadowe, to be layd out hereafter, as the court shall appoynct." 1 Mass. Col. Rec. 156.

September 3d 1635. " Ordered, that the bounds of Rocksbury, on both sydes the towne, shalbe vewed, and a plott thereof drawne, and soe returned into the nexte Generall Court. Ensigne Jennison and Mr. Aspinwall are appoyncted to doe it." 1 Mass. Col. Rec. 159.

March 3d 1635–6. " Agreed, that Newe Towne bounds shall run 8 myles intc .he country from their meeteing howse." 1 Mass. Col. Rec. 166.

bury, Dorchester, Dedham, and Newtowne (afterwards Cam-

March 3d 1635–6. "Ensigne Jennison, Mr. Danforth and Mr. William Spencer are deputed a committee to set out the bounds of the newe plantation above Charles Ryver, against all other townes that joynes upon it, and each towne is permitted to send one of their members to accompany them ; also they are to vewe the meadowe about the Blue Hills, and to informe the next General Court to what towne it may most conveniently be layde." 1 Mass. Col. Rec. 166, 167.

March 3d 1635–6. "Ordered, that the bounds of Waterton shall run eight myles into the country from their meeteing howse, within the lynes already sett out ; and it is agreed that Sir Richard Saltonstall shall have one hundred acres of the meadowe, to be sett out indifferently by John Pratt and William Rescue." 1 Mass. Col. Rec. 167.

March 3d 1635–6. "With the consent of the deputies of Dorchester & Rocksbury, it is referd to Capt. Traske, Mr. Palmer, & William Cheesebrough, or any two of them, to sett out the bounds betwixte Rocksbury and Dorchester, which they are appoyncted to doe before midsummer nexte." 1 Mass. Col. Rec. 167.

March 3d 1635–6. "Ordered, that the land formerly graunted to Mr. Mathew Cradocke, merchant, shall extend a mile into the country from the ryver syde in all places.

"Ordered, that Charles Towne bounds shall run eight myles into the country from their meeteing howse, if noe other bounds intercept, reserveing the proprietie of fermes graunted to John Winthrop, Esqr., Mr. Nowell, Mr. Cradocke, and Mr. Wilson, to the owners thereof, as also free ingresse and egresse for the servants and cattell of the said gentlemen, and common for their cattell, on the backeside of Mr. Cradock's ferme." 1 Mass. Col. Rec. 168.

March 28th 1636. "The bounds of Dorchester is to run from the outside of Mr. Rossiter's ferme, nexte the sea, to the foote of the greate hill, from a marked tree to a second marked tree, in a straight lyne to the topp of the Blue Hills, nexte Naponsett, southe weste and by weste halfe a poynte westerly, and all the marshe ground from the south east syde of Mr. Newberry's howse, alonge Naponsett Ryver, to Mr. Stoughton's myll, to lye to Dorchester, and all the rest of the upland & marshe from Mr. Rossiter's ferme to the sea, and soe to the mouthe of the ryver beyonde Minotiquid Ryver, running into      countrie southward and to the west, to lye to Boston, onely excepting such land as they have right to by graunt of the court formerly. Robte Feke. John Talcott." 1 Mass. Col. Rec. 162.

April 13th 1636. "The 13th of the 2d Month 1636. Wee, whose names are underwritten, being appointed by the Generall Court to set out the bounds of the newe towne upon Charles Ryver, do agree that the bounds of the towne shall run from the markt tree by Charles Ryver on the north west side of Roxberry bounds, one mile & halfe north east, & from thence three miles north west, & so from thence five miles southe weste, & on the south west side Charles Ryver from the

bridge, and since, in part, Brighton). Among the grants of the

south east side of Roxberry bounds, to run four miles on a south west line, re-serving the proprieties to severall persons granted by speciall order of court. William Spencer. Nicholas Danforth. William Jennison." 1 Mass. Col. Rec. 173; (MS.) 175.

April 13th 1636. A second certificate of the same persons, " being appointed by the court to veiw the medow ground by Naponset Ryver, near the Blue Hills, and returne into the next court what towne it may best belong unto," by which they divide that meadow between Dorchester and " that part of Mount Wollas-ton which belongs to Boston, provided no man's propriety, unless by speciall order of courte, hinder the same. The court reserving power to set downe the extent." 1 Mass. Col. Rec. 173; (MS.) 175.

April 13th 1636 (recorded May 25th 1636). " Ordered, that all the rest of the ground lying betwixte Dorchester bounds and Boston bounds, shall belonge to the towne of Rocksbury easterly of Charles Ryver, (except the propryety of the aforesaid towne, which they have purchased of particular persons, Rocks-bury not to extend above eight myles in lenght from their meeteing howse.

" This order should have been entred nexte to the second order of the last leafe, dated 13 of the second moneth 1636." 1 Mass. Col. Rec. 176; (MS.) 177, from which this is printed.

September 8th 1636. " Ordered that the name of the plantation to bee setled above the falls of Charles Ryver is to bee Deddam, to enjoy all that land on the southerly and easterly side of Charles Ryver not formerly graunted to any towne or particular persons, and also to have five miles square on the other side of the ryver." 1 Mass. Col. Rec. 179, 180.

September 8th 1636. A committee " deputed to measure and set out the bounds of Roxberry and such farmes as lyes near adjoyning to the aforesaid plantation." 1 Mass. Col. Rec. 180.

November 15th 1637. A committee " appointed to set out the purchased land belonging to Dedham." And another " to set out the bounds between Dedham and Dorchester." 1 Mass. Col. Rec. 208, 209.

November 20th 1637. " Mount Woollaston is to be bounded by the Blew Hills, and the rest is to bee to Dorchester, to go to the bounds of Plimouth." 1 Mass. Col. Rec. 217.

May 2d 1638. " It is ordered that Newetowne shall henceforward be called Cambrige." 1 Mass. Col. Rec. 228.

May 16th 1638. A committee " appointed by this court to rectify the bounds betweene Roxberry & Dedham, (together with the lands purchased by Dedham,) have fully agreed concerning them by drawing an equall line of division by marked trees and stakes, which is corrected from the southeast side of Roxberry bounds by a streight northwest line running till it touch upon Charles Ryver Furthermore, in consideration of some straightnes at the westermost end of Rox

general court of the Colony, and as evidence of the theory of the

berry bounds, by reason of the course of the river, it is mutually agreed, that a portion of medow shall belong unto Roxberry, which joyneth towards the northeast upon Roxberry, and is bounded towards the southeast by certeine marked trees from the line of division aforesaid, (comprehending a narrow slip of upland,) unto a point of upland on the brows of the marsh, and from thence by the northermost point of a little hillock of upland in the marsh straight on to the ryver." 1 Mass. Col. Rec. 230, 231.

May 16th 1638. A similar report, establishing the bounds between Dedham and Dorchester, by "striking the head line of Dorchester from a marked tree by a fresh brooke (now commonly called Huggins Brooke) to a certeine stake of upon Dorchester plaine towards the top of the Great Blew Hill," and thence southwesterly to " Plimouth bounds." 1 Mass. Col. Rec. 231.

January 20th 1639–40. A committee " having full authority, from the townes wherein wee dwell, to end all controversyes concerning the line of partition betweene Boston and Rocksbury at Muddy River, concerning which some doubt hath beene made, have agreed that the trees, as farre as they have beene marked by Capt. Jennison, shall stand for parting limits betweene both townes, and from thence to run to the corner of Dedham lands next adjoyning." And another report settling the bounds between Boston and Cambridge. 112'Mass. Archives, fol. 4. 1 Mass. Col. Rec. 341, 342.

June 14th 1642. Daniell Fairefeild sentenced, among other things, to be " confined to Boston neck, so as if hee bee found at any time dureing his life to go out of Boston neck, that is, beyond the railes toward Roxberry, or beyond the low water marke, hee shalbee put to death upon due conviction thereof." 2 Mass Col. Rec. 13.

May 10th 1643. " The whole plantation within this jurisdiction is divided into four sheires, to wit, Essex — Salem, Linn," &c. " Middlesex — Charlestowne, Cambridge, Watertowne," &c. " Suffolk — Boston, Roxberry, Dorchester, Dedham," &c. " Norfolk— Salsberry, Hampton, Haverill," &c. 2 Mass. Col. Rec. 38.

October 17th 1643. " Dedham hath 3 weeks further time granted them to settle their bounds." A new committee appointed " to lay out the land of Roxberry men ; and Capt. Keayne should have his 400 acres there layd' out by the same men, if it bee there to bee had near Dedham and Watertowne." 2 Mass. Col. Rec. 50.

May 12th 1675. A committee appointed October 7th 1674 "to heare the difference betwixt Roxbury and Dedham concerning a line betwixt the two townes," report thus : " Wee, having heard theire allegations and perused the evidences, finde that Roxbury had once a right and title unto the line which they claime; but by evidence and agreement wee finde the two townes of Roxbury and Dedham have made an agreement of another line, which was runne oy both tounes in the yeares 1651 & 1654, to be the line of divission betwixt the

shore lines of towns, the parties referred to the orders of 1637
and 1640, about Noddle's Island,* and of 1641, 1647 and 1649,
about the title to the sea shore between high and low water
mark.† The defendants also referred to the acts of 1651 and

two tounes; but if any of Roxbury have any propriety within the said line
towards Dedham, they shall enjoy their particccular propriety, and Dedham en-
joy their purchased land purchast of Roxbury." And their report is accepted.
5 Mass. Col. Rec. 25, 37, 38.

  * March 9th 1636–7. "Nodles Iland is layd to Boston." 1 Mass. Col.
Rec. 189.

  May 13th 1640. " It is declared, that the flats round about Nodles Iland do
belong to Nodles Iland to the ordinary lowe water marke." 1 Mass. Col. Rec.
291.

  † Ordinance of 1641. " Every inhabitant that is an howse holder shall have
free fishing and fowling in any great ponds and bayes, coves and rivers, so farre as
the sea ebbes and flowes within the presincts of the towne where they dwell, un-
lesse the free men of the same towne or the Generall Court have otherwise ap-
propriated them; provided that this shall not be extended to give leave to any
man to come upon others proprietie without there leave." Body of Liberties,
art. 16, 28 Mass. Hist. Coll. 219.

  Amended in 1647 thus : " The which clearly to determine ; It is declared, that
in all creeks, coves and other places about and upon salt water, where the sea
ebbs and flows, the proprietor or the land adjoyning shall have propriety to the
low water mark, where the sea doth not ebbe above a hundred rods, and not
more wheresoever it ebbs further: provided that such proprietor shall not by this
liberty have power to stop or hinder the passage of boats or other vessels, in or
through any sea, creeks or coves, to other men's houses or lands." Mass. Col.
Laws, (ed. 1660) 50 ; (ed. 1672) 90, 91 ; Anc. Chart. 148, 149.

  Resolve of October 1649. " The inhabitants of a towne within this jurisdic-
tion, at their first siting downe, did generally agree to set apart a certeine parcell
of land, to the value of about 20 acres, lying between the salt marsh and the low
water marke, for the use of the whole towne, to be improved for thatching houses,
the want whereof is very prejuditiall to the towne, since which time this honored
Generall Courte, by an order of theirs, have made all the lands to low water marke
to be the proprietors of the land joyning thereunto [or " to belong to the pro-
prietors of the land adjoyning thereunto "]. The aforesaid inhabitants, not being
able to resolve themselves, humbly desire the resolution of this honnoured court,
whether the order of the court make void the preceding toune order. The
court doth conceive the court's order doth not disannul the order of the toune,
preceding it." 2 Mass. Col. Rec. 284. [" In answer to the tounes quaery, the
resolution of the courte is, that the courte order doth not disannull the order of
the towne preceding it. By both." 3 Mass. Col. Rec. 181.]

  VOL. IX.           30

1685, " for the prevention of quæstions and suits at law that might arise upon deeds of houses and lands, wherein the word heire * is omitted," requiring words of limitation to pass an es-. tate of inheritance, except in grants from towns ; 4 Mass. Col. Rec. pt. I. 39 ; 5 Mass. Col. Rec. 470 ; and the act of May 1672, making continuous possession of land a good title. 4 Mass. Col. Rec. pt. II. 515. [3 Mass. Col. Rec. 422. Mass. Col. Laws, (ed. 1672,) 124. Anc. Chart. 175.]

The Province Charter of 1691, after reciting the Plymouth and Massachusetts Colony Charters, and defining the bounds of the Province, granted its territory to the inhabitants thereof; and did " grant and ordain that all and every such lands, tenements and hereditaments, and all other estates, which any person or persons or bodies politick or corporate, towns, villages, colleges or schools, do hold or enjoy, or ought to hold and enjoy, within the bounds aforesaid, by or under any grant or estate duly made or granted by any general court formerly held, or by virtue of the letters patent herein before recited, or by any other lawful right or title whatsoever, shall be by such person and persons, bodies politick and corporate, towns, villages, colleges or schools, their respective heirs, successors and assigns for ever hereafter held and enjoyed, according to the purport and intent of such respective grant, under and subject nevertheless to the rents and services thereby reserved or made payable, any matter or thing whatsoever to the contrary notwithstanding." Anc. Chart. 25, 26, 27. By *St.* 4 W. & M. (1692) it was enacted that " the bounds of all townships shall be and continue as heretofore granted and settled respectively, and shall be run betwixt town and town and marks renewed once in three years by two of the selectmen of each town," &c. Anc. Chart. 247. The order of the general court of November 13th 1705, incorporating the inhabitants of Muddy River as a town by the name of Brook-lyn, is copied in the margin.†

---

* 5 Mass. Col. Rec. (MS.) 472. Mass. Col. Laws, (ed. 1672,) p. 32. Not " house," as printed in the Commonwealth's edition of the Massachusetts Colony Records.

† November 13th 1705. In Council. " The order passed by the Represen-

Stephen P. Fuller testified that the distance from the meeting-house in Roxbury (which stands on the site of the first meeting-house in that town) to the westerly line of the town was between seven and eight miles.

The defendants gave in evidence before the arbitrator extracts from the Roxbury Book of Possessions, and records of grants by that town, some of which included a few acres of salt marsh " lying at " or " neare Gravelly Poynt," and " butting upon the sea " on the north or west; settlements of the lines between Roxbury and Newton, Dorchester, Dedham and Boston, 1679–1699; perambulations of the boundaries of Roxbury by the selectmen from 1708 to 1851; and an indenture between the town of Roxbury and David Sears, dated November 15th 1832, containing mutual releases of claims to flats on each side of a certain line, and by which Sears released to said town his claim to the demanded premises; none of which need be particularly stated.

The defendants also relied on the *Sts.* of 1814, *c.* 39, incorporating the Boston and Roxbury Mill Corporation, with authority to erect a solid dam from Boston to Brookline, so as effectually to exclude the tide water from the premises described in the information; and 1822, *c.* 34, authorizing the widening of this dam; the resolve of 1823, *c.* 49, authorizing that corporation to occupy and use certain flats on the northerly side of its dam; the *St.* of 1824, *c.* 26, incorporating the Boston Water Power Company, with authority to " purchase and hold any

---

tatives upon the petition of the Inhabitants of Muddy River, a Hamlet of Boston, read on Saturday last, viz: Ordered that the prayer of the petition be granted, and the powers and privileges of a township be given to the Inhabitants of the land commonly known by the name of Muddy River, the town to be called Brooklyn, who are hereby enjoyned to build a meeting house and obtain an able orthodox minister according to the direction of the law to be settled among them within the space of three years next coming: Provided that all common lands belonging to the town of Boston lying within the bounds of the said Muddy River not disposed of or allotted out shall still remain to the Proprietors of the said lands' Which order being read again was concurred. And is consented to. J. Dudley.*
3 General Court Rec. 16?

quantity of the water power created by the establishment of the dams between Boston and Roxbury, or any lands contiguous to said dams or within the limits of the basins created therewith or either of them," saving the rights of the city of Boston or any of the adjacent towns as they then existed; an indenture dated May 9th 1832, by which the Boston and Roxbury Mill Corporation conveyed to the Boston Water Power Company all its rights in the land in the empty basin, together with all the tide water mill power; the resolve of 1852, *c.* 79, authorizing the abandonment of the tide mill power and the filling up of the Back Bay; indentures between the Boston Water Power Company and the Boston and Roxbury Mill Corporation respectively and the Commonwealth, dated June 9th 1854, and December 30th 1856, releasing and granting away said mill power and allowing the empty basin to be filled up, and making the milldam a perpetual highway; and an indenture, dated December 11th 1856, between the Boston Water Power Company, the city of Boston and the Commonwealth, undertaking to control the drainage of Roxbury through the empty basin.

The defendants also put in evidence the report of a committee of the mayor and aldermen of Boston, respecting the boundary line between Boston and Roxbury, which was duly accepted by the mayor and aldermen of Boston and by the selectmen and the town of Roxbury in 1823,* and a petition of the mayor and

---

* "Monday April 28th 1823. At a meeting of the mayor and aldermen held this day, the committee appointed to confer with the selectmen of Roxbury respecting the boundary line, and to fix the same between that town and Boston, reported as follows:

"The undersigned having been directed to confer with the selectmen of Roxbury respecting the boundary line, and to fix the same between that town and Boston, which passes through the empty basin (so called) of the Boston and Roxbury Mill Corporation, he has attended to that service, and submits the following report, viz:

"By the erection of the empty basin above mentioned, the most of the waters, of course, which once occupied that space, have been excluded, some of the channels diverted from their original course, and thereby, for a very considerable distance, the natural boundary has become almost obliterated. The parties have agreed, therefore, that the following shall hereafter constitute and be considered

aldermen of Boston and the selectmen of Roxbury to the legislature in 1836,* both of which are copied in the margin.   And they relied upon the *St.* of 1836, *c.* 37, by which the lines so defined, " which have been mutually agreed upon between the

the boundary line in the section to which they refer, between Boston and Roxbury, viz: beginning at a stake driven on the southeasterly side of the dyke, which forms the southwesterly boundary of said basin, from which point the centre of the steeple of Park Street Meeting-house in Boston bears north 53° (say fifty three degrees) east.   The line to run in this direction from the point first mentioned about two hundred and ninety rods, until it strikes the centre of the main channel (which yet remains) westerly of the rope walks in said Boston, and thence northerly in the centre of said channel about one hundred and twenty five rods to a point two hundred feet distance southerly from the main branch of the Milldam or Western Avenue.   The boundary line of said Roxbury thence turning nearly at right angles, and running westerly nearly on a parallel line with said Milldam until it strikes the branch thereof which leads to Roxbury, at which point a stone monument has been erected.   The undersigned has agreed with the selectmen of Roxbury that permanent monuments to mark the boundaries agreed upon shall be erected; one at the first mentioned or starting point upon the dyke ; and one at the termination of the first direction in the centre of the channel aforesaid.

" In running this line in the first direction, it will be seen by reference to the map that some deviations from the original or natural boundary and some exchanges of territory are involved, and consequently, it is supposed that the sanction of the legislature will be necessary to render valid the arrangement agreed to, and it is proposed that the same shall be obtained at the next session of the General Court.                                    Joseph Jenkins."

* " To the Honorable the Senate and House of Representatives in General Court assembled :

" The mayor and aldermen of the city of Boston and the selectmen of the town of Roxbury respectively represent that the original lines dividing the territory of the said city from the territory of said town, lying between Boston Neck and the Boston and Roxbury Milldam, are crooked and inconveniently irregular, and that said corporations, to remedy the same, by their agents for this purpose duly authorized, have mutually agreed to straighten said lines, and have run the same and erected stone monuments to the acceptance of the said corporations respectively, as set in the copies of their proceedings and the plan hereto annexed.

" Wherefore the said corporations pray, that said new line so agreed on may be established and confirmed as the true line between said corporations, and as bounds, &c."

city of Boston and town of Roxbury, shall hereafter constitut and be considered the boundary lines in the section to which they refer, between the said city and said town ; " " and the ter ritory and jurisdiction on either side of said lines as hereby established are accordingly confirmed to said city and said town respectively."

The defendants also introduced testimony that the demandec premises and other flats in the empty basin were always known as Roxbury Flats ; and that after the water was excluded by the milldam, the grass spread gradually over the flats, and part of it · was cut and sold by Sears in 1824, and by the town of Roxbury " within a year or two of 1825 " and nearly every year from 1831 to 1853, and was never cut by any one else.

Upon the return of the arbitrator's award and report, each party moved for judgment thereon in its own favor.

This case was argued at Boston at March term, 1858.

S. Bartlett, (T. B. Hall with him,) for the Commonwealth. 1. The information, as amended, sufficiently sets forth "the title and claim of the Commonwealth," as required by the Rev. Sts. c. 108, § 1. It would seem that the title of the Commonwealth is a fee by record and grant under the Plymouth Company, and not jure coronæ by the feudal prerogative title, which ascribes to the king all domain not shown to have been granted; and if this is so, an allegation of title and claim by prerogative could not be sustained. Mass. Col. Charter, Anc. Chart. 1–6. 2 Bl. Com. 51, 53. Attorney General v. Chambers, 4 DeGex, Macn. & Gord. 206. Commonwealth v. Alger, 7 Cush. 58, 65, 66. Commonwealth v. Charlestown, 1 Pick. 180, 183. But if the title of the seashore and fundus maris to the extent of the marine league can only be by prerogative, then the information shows the demanded premises to fall within it, both by the description, and by the averment that the title is in the Commonwealth under the Colony and Province Charters.

2. The description of the premises in the information as " lands, channels and flats situated in the Back Bay in the town of Roxbury," if relied upon by the defendants as conclusive

against the right of the Commonwealth, should have been taken advantage of by demurrer. But it is merely descriptive of municipal jurisdiction.

3. By the terms of the submission and award all questions of law are expressly reserved for the determination of this court The question of the construction of the grant of 1636, as applied to the circumstances of the place and time, is a question of law.

4. It is settled by the decisions in England and in this commonwealth that the shores of the sea and the ground and soil of the coast belonged by prerogative to the king, and vested in the government of the Colony, Province and Commonwealth of Massachusetts. *Attorney General* v. *London*, 8 Beav. 270 ; 1 H. L. Cas. 440 ; 12 Beav. 8, 171 ; 2 Macn. & Gord. 247. *Attorney General* v. *Chambers*, 4 DeGex, Macn. & Gord. 206. *Benest* v. *Pipon*, 1 Knapp, 60. *In re Hull & Selby Railway*, 5 M. & W. 327. 45 Law Mag. 70. 3 Law Mag. & Rev. 128. *Commonwealth* v. *Alger*, 7 Cush. 53. *Commonwealth* v. *Charlestown*, 1 Pick. 180. Orders of 1640–1649, *ante*, 465, note.

5. The arbitrator's construction of the order of the general court of the Colony in 1636 was erroneous. If the words " easterly of Charles River " are to be treated as a boundary on the lower part of that river, which was an arm of the sea, they would be limited by the principles of law, before the ordinance of 1647, to high water mark. And the other two abuttals, " Boston bounds " and " Dorchester bounds," must be presumed, until the contrary is shown, to be limited by the shore.

But the words " easterly of Charles River " must be referred, not to the arm of the sea called the Back Bay, (from which the premises granted lay southerly, not easterly,) but to that line of Charles River, which then formed the whole westerly boundary of Roxbury; Brookline (then Boston) extending to that part of the river on one side and Dorchester on the other side. Orders of 1633–1640 in Mass. Col. Rec.; *ante*, 461–464, note. [See plan, *ante*, 459.] Besides ; the grant of 1636 is obviously of land extending into the interior, according to the usual mode of enlarging grants at that period. 1 Mass. Col. Rec. 166, 168, 176 ; *ante*, 461, 462, 463, note. The coast had been previously

granted to Roxbury, and the bounds there defined. 1 Mass. Col. Rec. 103, 159; *ante,* 461, note.

If the grant was not limited by the shore, but extended over the bottom of the sea, it must extend as far seaward as its abuttals, Boston bounds and Dorchester bounds, of the extent of which the defendants produce no proof. But the Boston line is shown to have stopped originally with the shore by a long series of legislative acts granting liberties to Boston, and leave to littoral proprietors to extend wharves. If this grant was of the *fundus maris* in 1636, then the ordinance of 1647 had no application to the shore of Roxbury, and the rights of littoral proprietors under grants from that town may not have the common construction.

6. The acts of the town of Roxbury, as shown by its records and the perambulations of its officers, made many years after the alleged grant, and the agreements between the town of Roxbury and individuals, are inadmissible to disprove the title of the Commonwealth.

7. The acts of the legislature, incorporating the Boston and Roxbury Mill Corporation, and excluding the tide water from the empty basin, and inclosing it in the full basin, gave no title to Roxbury. And there is no principle upon which they can be deemed an abandonment of the title in the soil to the littoral proprietors.

8. The agreement of 1823 between Boston and Roxbury, for straightening their boundary line, upon its face had reference to municipal jurisdiction only, and depended on legislative sanction.

9. So the petition to the legislature in 1836 relates only to straightening the lines " dividing the territory of said city from the territory of said town." The *St.* of 1836, *c.* 37, passed upon this petition, copies from this agreement the word " territory," and adds the word "jurisdiction " to make the meaning certain. *Ante,* 468. The word " territory," as used in establishing boundary lines between towns or counties, means jurisdiction, not title. Prov. St. 13 G. 3, (1773,) Anc. Chart. 678, 679. *Sts.* 1785, *c.* 11; 1792, *c.* 72; 1794, *c.* 31; 1833, *c.* 15; 1836, *c.* 193; 1837, *cc.* 42, 83; 1840, *c.* 36. Rev. Sts. *c.* 14.

10. The acts relied on to prove disseisin were transitory and not in continuous years, and covered but a small part of the territory; and were inadmissible to prove a disseisin. *Slater* v. *Jepherson*, 6 Cush. 129. This is a question of fact, and has been disposed of as such by the arbitrator. And before the Rev. Sts. *c.* 119, § 12, the Commonwealth could not be disseised, and twenty years had not elapsed since that before this information was filed. See also *St.* 1852, *c.* 253.

11. The defendants' specification of the right of drainage is a special disclaimer, and thus of itself a waiver of the general issue, and an admission of the plaintiff's title. Jackson on Real Actions, 100, 101. The *St.* of 1852, *c.* 312, does not affect the form of proceeding upon informations on the Rev. Sts. *c.* 108. Dwarris on Sts. (2d ed.) 523. Under any system of pleading, such easement, if it exists, is no defence to a recovery by the Commonwealth of both fee and possession, subject to it; but leaves the protection of such easement, if interfered with, to action on the case or bill in equity.

If this right ever existed, it was cut off by building the mill-dam, under statutes which provided an indemnity. *Boston & Roxbury Mill Corporation* v. *Newman*, 12 Pick. 467. And the referee finds that even if this question came properly before him, there was no evidence which could sustain the claim.

12. The arbitrator, having reported all the facts, the court, after revising his decision in matter of law, should render judgment for the Commonwealth without recommitting the case.

*R. Fletcher & J. Giles*, (*W. Gaston* with them,) for the defendants. 1. The information does not set forth the title of the Commonwealth to the premises claimed as is required by the Rev. Sts. *c.* 108, §§ 1, 2. This defect is substantial, and is not cured by the pleadings. *Attorney General* v. *London*, 2 Macn. & Gord. 247. The Commonwealth cannot under this information set up a prerogative title to the premises.

2. The premises claimed and described, being, as alleged in the information, within the bounds of Roxbury, were acquired in fee by the original town of Roxbury, by settlement in 1630,

and subsequent grant of town bounds; it appearing that Roxbury has always owned, in its corporate capacity, all the lands within its bounds, not belonging to individuals.

3. The arbitrator having decided, as matter of law, (which was also expressly admitted by the counsel for the Commonwealth at the hearing before the arbitrator, and is therefore not subject to review,) that the act of 1636 was a grant in fee of all the land described in it; and the arbitrator having also found by the evidence and view, and decided, as matter of fact, that the demanded premises were embraced within the descriptive bounds of that grant; the award is decisive of the case, and conclusive upon the parties, under the submission. See submission and award, *ante*, 454, 455, 456.

4. By the common law of Massachusetts, the Commonwealth has jurisdiction and dominion of the seashore and the land where the tide ebbs and flows below one hundred rods from high water mark, for public uses only; but does not own and has no exclusive right to the soil as private property. Angell on Tide Waters, (2d ed.) 234–248. *East Haven* v. *Hemingway*, 7 Conn. 186. *Chapman* v. *Kimball*, 9 Conn. 38. *Hart* v. *Hill*, 1 Whart. 131, 137. *Ball* v. *Slack*, 2 Whart. 508. *Gough* v. *Bell*, 2 Zab. 441. 2 Smith's Lead. Cas. (5th Amer. ed.) 224–227. Orders about Noddle's Island and about flats, *ante*, 465, note. Acts allowing extension of wharves, and establishing harbor lines. See also the more recent English authorities, cited for the plaintiff, *ante*, 471.

5. If the lands in question belonged to the government, the special grant of the Colony Government of 1636 was upon its face a grant of the soil. That grant, so far as it is ambiguous, is to be construed against the grantor, and conveyed to Roxbury the demanded premises in fee; and they have always since been claimed, held and occupied by the town or its grantees, claiming a title in fee to the same. *Coolidge* v. *Williams*, 4 Mass. 144. *Saltonstall* v. *Long Wharf*, 7 Cush. 195. *Lapish* v. *Bangor Bank*, 8 Greenl. 85. *Thomas* v. *Hatch*, 3 Sumner, 170. *Handly* v. *Anthony*, 5 Wheat. 374. *McCullock* v. *Aten*, 2 Ohio, 309 *Wilson* v. *Forbes*, 2 Dev. 30. *Stinson* v. *Butler*, 4 Blackf. 285

*Felder* v. *Bonnett*, 2 M'Mullan, 44. *Jones* v. *Janney*, 8 W. & S. 436. *Commonwealth* v. *Garner*, 3 Grat. 655. How can it be construed as a grant of both soil and jurisdiction over the upland, and of jurisdiction only over the flats ?

6. The establishment and perambulations of boundaries of towns by the authorized public officers are competent evidence of the lines thereby defined.

7. The *St.* of 1814, *c.* 39, incorporating the Boston and Rox bury Mill Corporation, authorizing the effectual exclusion of tide water from the empty basin and the actual exclusion thereof by the milldam for nearly forty years, now made perpetual by the agreements of the Commonwealth ; and the subsequent acts of -the legislature relative to said corporation and the Boston Water Power Company and the lands in said basin ; all recognizing private rights in said lands, but neither claiming nor reserving any public rights — when construed by the uniform usage of the Commonwealth in granting wharf acts, must be held to have relinquished any public rights in the premises to the owners of the adjoining lands, so that the Commonwealth cannot now set up any title to the premises claimed in this information. *Bowman* v. *Wathen*, 2 McLean, 376.

8. The bounds of Boston and Roxbury, as run out and established by the agreement of 1823, as the bounds according to the grant of 1636, having been fairly run out as soon as practicable, after the tide was excluded from the empty basin, and been assented to by the legislature, and recognized, acquiesced in and acted on, from that time to the present, must now be taken as the true bounds of the grant of 1636. *Kellogg* v. *Smith*, 7 Cush. 375. *M'Nairy* v. *Hightour*, 2 Overton, 304. *Newsom* v. *Pryor*, 7 Wheat. 7. *Lerned* v. *Morrill*, 2 N. H. 197. *Kennebec Purchase* v. *Tiffany*, 1 Greenl. 219. *Brown* v. *Edson*, 23 Verm. 435. *Berry* v. *Garland*, 6 Foster, 473. *Riley* v. *Griffin*, 16 Georgia, 141. *St.* 1836, *c.* 37.

9. The *St.* of 1836, *c.* 37, authoritatively established the line so run out as the line and boundary of the grant of 1636 ; so that Roxbury has a clear right, under this act of the legislature, to hold, as against the Commonwealth, the territory, as well

as the jurisdiction, up to that line, as the true line and boundary of the grant of 1636. *United States* v. *Gratiot*, 14 Pet. 562.

10. The evidence of possession, on the part of Roxbury, shows a title to the premises in question by disseisin and possession; or if not, it shows a title in Roxbury under the act of 1636, and according to the bounds run out in 1823 and confirmed in 1836, and also under the deed from Sears in 1832.

11. However the question of title to the soil in the premises may be decided, the defendants have the right of drainage through the natural channels thereof, as set forth and claimed in their answer. If the Commonwealth recovers, it must be subject to that right. *Morgan* v. *Moore*, 3 Gray, 319.

12. If the award of the arbitrator is set aside, judgment cannot be rendered for the Commonwealth, but the case must be recommitted to the arbitrator, or the rule of reference discharged and the case stand for trial.

SHAW, C. J. [After stating the substance of the pleadings, amendments and rule of reference, and reciting the report of the arbitrator.] The objection that the premises were not described in the information with sufficient certainty, we suppose, was removed by the amendments afterward made, and by the agreement in the rule of reference that the pleadings might be amended, if need be, so as to embrace all the conflicting claims, rights and interests of the parties within the bounds described in the resolve of 1852, *c.* 79.

Whether the town of West Roxbury was summoned in, or came in on its own motion, does not appear, and is not perhaps material.

The defendants now move the court to accept the report of the arbitrator, and to render judgment thereon in their behalf; and the Commonwealth, on the report and the questions of law raised therein for the final adjudication of the whole court, moves for judgment for the Commonwealth.

The parties have respectively referred to such charters, laws, records, grants and documentary evidence, as they considered material to their respective rights; also the depositions, and some *viva voce* testimony taken at the hearing, are embraced in

the case submitted; so that we understand that the whole evidence is before us, upon which these questions of law arise, and the rights of the parties depend.

Before proceeding to a direct consideration of the award, it is necessary to understand precisely what is the subject matter of controversy, and what was the exact issue submitted to the referee. We understand that by the information, as amended before the reference, and twice at or before the hearing, the Commonwealth claims to hold and own, as proprietor in fee, the soil of that portion of the Back Bay, within the empty basin, which, before the tide water was excluded from said bay by the erection of the Milldam or Western Avenue, was within the ordinary ebb and flow of the tide, and which lay below, that is, so far distant from the upland, as tò be below the line of riparian proprietorship. By this term we understand, in its application to a case like the present, where the tide ebbs more than one hundred rods from the line of ordinary high water, that line over and along the flats, over which the tide ordinarily ebbs and flows, at a distance of one hundred rods or sixteen hundred and fifty feet from the adjoining upland. We understand therefore, that, whatever were the terms of the information before its amendments, as it now stands, the Commonwealth makes no claim to any land in the full basin, nor to any land in the empty basin, nearer to the original line of ordinary high water mark than one hundred rods, being the ordinary line of high water mark, before the exclusion of the tide water, in its natural ebb and flow.

Again; in regard to the right of drainage, which the respondents have put forward prominently in their answer; unquestionably such owners of lands in Roxbury, whether the municipal corporation, or individual proprietors of such lands as have and enjoy a right of drainage into and through the natural watercourses emptying into these channels and through them into the sea, have a right to the continued use and enjoyment of such watercourses, whether the soil, upon and over which they pass, be owned by the Commonwealth or by municipal corporations or individuals; and no question respecting them arises in the present case, which raises the question of title only

And further, the learned arbitrator has stated in his report, that all evidence offered on either side, whether objected to or not, was admitted by him, subject to the opinion of the whole court in regard to its competency, under this reservation, that if any part of the evidence is found to be incompetent, all facts, which such evidence would conduce to prove, and which are not proved otherwise, must be laid out of the case.

I. We come now to the consideration of the questions raised upon the report of the arbitrator; and by far the most important is that first stated. It thus appears in the report:

" The counsel for the Commonwealth contended that the title to the demanded premises, on the first settlement of the country, was vested in the Colony, and thence by the acts of the several governments passed through the Province to the Commonwealth. This proposition I adopted, and held, that the fee still remained in the Commonwealth, unless its government, or that of one of its predecessors, had aliened it."

In this position we entirely concur ; and before going further, it may be useful to add some authorities to corroborate it, and to suggest a qualification, proper to be considered, in its application to the present case.

At the time of the settlement of Massachusetts and the other English colonies in America, the only source of title to the vacant and unsettled lands of this portion of the continent, claimed by the crown of England by right of discovery, was a grant from the king. It was not merely the only source of legal title to the soil, but the only source of authority for exercising limited powers of government, in and over the lands thus granted.

The theory universally adopted, acted upon, and sanctioned by a long course of judicial decisions of the highest authority, was, that the Indians found upon this continent had no legal title to the soil, as that term was understood at the common law and among civilized nations, no fee in the land, but only a temporary right of occupancy, for which it was perhaps equitable to make them some allowance. The fee was considered to be in the sovereign, by whose subjects it was dis

covered, and in whose name it was taken possession of. Under this rule, this part of North America was claimed and held by the king of England. This jurisdiction extended to all tide waters, included in said territory, in the same manner as in those held by the crown within the realm of England, subject to the public use, according to the rules of the common law. But as it was held that the king, by virtue of his prerogative, had authority to create and grant political powers, necessary to the government of these new countries, it was held, that, where charters were granted to organized bodies with power of governing the colonies to be settled, like that of Charles I. to the Governor and Company of Massachusetts, they conveyed the prerogative powers of the crown, and as such included the arms of the sea, and all tide waters, to be held, like those of the crown, in trust for the public. The grantees thereby became invested with the ordinary right of property in lands for cultivation and settlement, and the extraordinary right of government, subject only to their allegiance and subordination to the parent government, including herein a power over all sea shores and tide waters.

Instead of resorting anew to the original charters, we wil. state what this court held to be the result and legal effect of them, in a recent case which was much discussed, and was decided after much consideration. *Commonwealth* v. *Alger*, 7 Cush. 65, 66. The court there say : " The charter under which the Colony was formed and settled — first, that of James I. to the Plymouth Company, and subsequently that of Charles I. in 1628, reciting an assignment of part of the territory formerly granted to the Plymouth Company, by that company, being. all that part of said territory, [described,] which afterwards constituted the Colony of Massachusetts, to Sir Henry Roswell and his associates — did proceed to grant and confirm to Sir Henry Roswell and his associates all the said lands described, and every part and parcel thereof, and all the islands, rivers, ports, havens, waters, fishings, fishes, mines, minerals, jurisdictions, franchises, royalties, liberties, privileges, commodities and premises whatsoever, with the appurtenances. This charter was not

merely a grant of property within the realm of England, but it contained provisions for the establishment of a separate depend-ent government under the allegiance of the king; and the gov-ernment thereby constituted was invested with all the civil and political powers to enable it to establish and govern the Col-ony, and to make laws for that purpose, not repugnant to the laws of England."

We may add here, in explanation, that the Charter provided for the organization of the Company, by the appointment of a governor, deputy governor, and eighteen assistants, to be chosen by the freemen of the Company, after the first appointment made by the Charter itself. The governor, deputy governor, assistants and freemen, were authorized to admit freemen, to elect officers for the ordering of their affairs, and to make laws and ordinances, for the good and welfare of said company, and for the government and ordering, disposition and management of the said lands and plantation, and the people inhabiting and to inhabit the same, as to them from time to time should be thought meet, not repugnant to the laws of England. Anc. Chart. 8, 9.

It is probable, as it has been suggested, that the Charter was intended to create and establish a trading corporation, to meet and act in England, with large powers to manage a planting and trading colony. But there being no restriction upon their meeting and acting anywhere within the king's dominions; in about two years, the Company, by advice of counsel, determined to remove to Massachusetts; and in 1630 the governor, deputy governor, and many of the assistants and freemen, came to Massachusetts, bringing the Charter with them. From that time all meetings were held in the Colony. For a few of the first years, and whilst the plantations and settlements were few, meetings were attended according to the Charter, by all such freemen as chose to attend; but, as early as 1634, it was pro-vided that the freemen of each plantation might choose two or three before every general court, who should have the full voices of all the freemen to act with the governor and assistants in making laws, granting lands, &c., and other affairs, excepting

elections. 1 Mass. Col. Rec. 118. Here, then, was the origin
of a representative government, probably not contemplated by
the Charter, but perhaps not wholly inconsistent with it, because,
if all freemen had a right to act, those delegated, being freemen,
had that right; if repugnant at all to the Charter, it was in ex-
cluding those not appointed delegates.

In 1644, ten years later, a still more decisive step was taken.
It was probably found that the delegates quite outnumbered the
governor and assistants, and would of course outvote them,
acting in one body. Divers inconveniences having been found
in this mode of proceeding, and accounting it wisdom to follow
the laudable practice of other states, it was ordered that hence-
forth the two bodies shall sit and act apart, in separate bodies,
each having the initiative in proposing laws and measures, and
each having a negative on the other, so that no act could pass
without the concurrence of both bodies. 2 Mass. Col. Rec. 58.
In this we perceive the complete establishment of a representa-
tive government, with a distribution and balance of powers.
Whether this was perfectly consistent with the Charter or not,
it was acquiesced in, acted on, and afterwards confirmed by the
Province Charter. See *Commonwealth* v. *Charlestown,* 1 Pick.
183.

Most of the English colonies had a similar origin in the char-
ter of the sovereign, which granted not only the title to the soil,
but the powers of government, and, as incident thereto, the right
of the sovereign over the sea shores, and those powers denomi-
nated *regalia.* The nature and extent of these grants, both of
property and powers, have been held to be regulated by the
common law of England, which the English emigrants claimed
as their birthright, and brought with them. This introduced
and established the common law of England, as regulating the
relative rights of the government and people in this country to
the sea and sea shores. The effect of this charter was, to grant
to the Governor and Company, as a body, the *jura regalia* or
prerogative rights of the crown, to be held for the Colony, as the
crown held them for the realm of England; and also the ordi-
nary right of property in the soil, to be held and granted on the

liberal tenure of free and common socage, as private rights in real estate are held at common law. *Martin* v. *Waddell*, 16 Pet. 367. The same rule, substantially, was established in all the colonial governments, the authorities for which, we think, are too numerous and uniform to require citation.

There is another subject which we think it necessary to con sider, before proceeding to the next point in the report of th arbitrator. We had considered it settled beyond controversy that, by the common law of England, the right of soil, not only in the sea, the *fundus maris*, was in the king, but also in the sea shore, the land between high and low water mark; and that *prima facie* the land of all private proprietors, towards the sea shore, and upon bays, arms of the sea, creeks and coves, where the sea ebbs and flows, was bounded by high water mark; but it having been intimated at the argument that some new views had recently been advanced on this subject in England, we were led to look at the authorities cited. The law in this common-wealth seemed to be settled by the case already cited, of *Commonwealth* v. *Alger*, 7 Cush. 65. There it is declared that by the common law of England, as it stood long before the settle-ment of this country, the title to flats was in the king, that it was so held by him in trust for public uses. This rule, appar-ently so well settled and established both in England and this country, seems to us not to have been shaken or doubted in any recent English case, though some bold speculations may have been advanced by ingenious counsel in argument, or by acute essay writers in the law periodicals.

In the case alluded to of the *Attorney General* v. *City of London*, reported in its several stages in various books, but finally decided by Lord Chancellor Cottenham in January 1850, this ground of the right of the crown seems to have been assumed on all sides, as the settled law of the land, and the matters of controversy turned on other points. It is so distinctly stated by Lord Langdale, Master of the Rolls, in 12 Beav. 26. See also *In re Hull & Selby Railway*, 5 M. & W. 327.

In the case of *Attorney General* v. *Chambers*, 4 De Gex, Macn. & Gord 206, decided by Lord Chancellor Cranworth, assisted

by Baron Alderson and Mr. Justice Maule, it was also assumed on all hands, that the limit of the proprietorship, in lands bordering on the sea shore, between the king on the sea side, and the private owner on the land side, was the line of high water mark; and the question elaborately discussed was, where precisely that line should be drawn. These distinguished judges, we believe for the first time, declared the rule of law, and defined that line to be, the medium line between the ordinary line of high water in ordinary spring tides at the full and change of the moon, and the ordinary line of high water at neap tides, at about midway in time between the full and change of the moon.

Without citing other authorities, we think these modern cases show that in whatever other respects the law may have been modified, the ancient rule, on the point stated, has not been changed, and therefore we assume the doctrine to be, as stated in *Commonwealth* v. *Alger*, and confirmed by the cases there cited, that at the time of the granting of the colony charters herein before stated, the king held the sea shores as well as the land under the sea; that he held the same *publici juris* for the use and benefit of all the subjects, for all useful purposes, the principal of which were navigation and the fisheries.

Taking this proposition, in connection with the proposition already stated, that the king had full power, in these unsettled parts of his dominion, out of the realm of England, to grant a title to the land for purposes of settlement, and such powers of government as might be necessary; and that a charter was granted, vesting the right of soil in the grantees, with very large powers of government, including all necessary to the control and management of all public interests, of navigation and fisheries, and of the sea shore and navigable waters; the effect of this charter was, to grant to the company both the *jus privatum* and the *jus publicum* of the crown; the *jus privatum*, or title to the land, to be held in fee, parcelled out to corporations and individuals, to be held in fee, subject to the rules of the common law, as private property; and the *jus publicum*, or all those rights of the crown in the sea, sea shore, bays and arms of the

sea, where the tide ebbs and flows, in trust for public use of all those who should become inhabitants of said territory and sub jects of said government.

We proceed now to the next and most essential part of thi award. The referee having come to the conclusion that th right of property in these flats is in the Commonwealth, unles it or its predecessors have aliened it, proceeds to state the in troduction by the defendant's counsel of an act of the genera court of the Colony of Massachusetts, passed May 25th 1636, their claim under it, and the referee's opinion thereon, closing thus : " I am therefore of opinion and do decide, that the act of 1636, in the liberal and proper construction of the language used, operated as a grant, and vested in the then town of Rox-bury the fee of the demanded premises."

In order rightly to weigh and estimate the legality of the con-clusion, to which the arbitrator thus came, in putting a con-struction upon the ancient grant thus mentioned, several things must be taken into consideration, and in this connection dates are important ; also what was the actual condition of the Colony at the time when the supposed grant to the town of Roxbury was made.

1. We are to inquire how grants of land were first made and set off to the parties interested, and how actual settlements were first made.

At one of the earliest meetings after the Charter, held in Lon-don, before the Company had thought of removing, a question naturally arose, how the adventurers should be reimbursed for their costs and charges, and to this end it was debated how some good course might be settled for the division of the lands. In the spring of 1629 a plan was agreed upon, for distributing the lands in the proportion of two hundred acres for every fifty pounds subscribed, and so in proportion ; and fifty acres for each servant sent over. A special government, subordinate to that of the governor and company, was appointed, to reside in Mas-sachusetts, consisting of thirteen persons, to be called the

* Passed April 13th, though recorded May 25th 1836. *Ante*, 463, note

Governor and Council of London's Plantation in the Massa-
chusetts Bay in New England; and this subordinate govern-
ment, of whom Governor Endicott, then gone to New England,
was to be the head, was authorized and required to make divi-
dend of lands to those entitled, and if such allotments were not
made within ten days after the settler's arrival, demand being
duly made, the settler was allowed to take up his allotment
upon any lands, not already appropriated. 1 Mass. Col. Rec. 42,
361–365. About the same time, for enlarging their pecuniary
means, provision was made for creating a new stock, with a like
right to an allotment of land. 1 Mass. Col. Rec. 68.

In consequence of these arrangements, when Governor Win-
throp and the body of assistants and freemen came over with
the Charter in 1630, a considerable number of allotments and
grants of land had been made by the local government, and
several settlements or plantations had been then formed. The
settlers, in selecting their allotments, would naturally take up
the lands in considerable numbers near each other, for their
better mutual security against the dreaded enemy, the Indians.
The terms " plantation," " town," and " township " seem to be
used almost indiscriminately to indicate a cluster or body of
persons inhabiting near each other; and when they became
designated by a name, certain powers were conferred upon them
by general orders and laws, such as to manage their own pru-
dential concerns, to elect deputies and the like, which in effect
made them municipal corporations ; and no formal acts of incor-
poration were granted till long afterwards.

At the second meeting in the Colony, at Charlestown, on the
7th of September 1630, the following order was passed : " It is
ordered that Trimountain shall be called Boston; Mattapan,
Dorchester; and the town upon Charles River, Watertown."
1 Mass. Col. Rec. 75. We doubt whether these places had any
formal act of incorporation during the existence of the Colony,
or any other recognition by the government of a corporate ex-
istence.

At the last meeting of the governor and assistants at Charles-
town, before removing to Boston, on the 28th of September

1630, an order passed indicating the several plantations or townships then existing, and their relative importance, by a rate assessed on them as follows, to raise £50 :

| | |
|---|---|
| Charlestown . . . . . . . . £ 7 | |
| Boston . . . . . . . 11 | |
| Dorchester . . . . . . . . 7 | |
| Roxbury . . . . . . . 5 | |
| Watertown . . . . . . . . 11 | |
| Medford . . . . . . . 3 | |
| Salem . . . . . . . . 3 | |
| Wessaguscus [Weymouth] . . . 2 | |
| Nantasket . . . . . . . . 1 | |
| | £50 |

We think no essential change in this respect took place till long after 1636, the date of the grant to Roxbury. Lands were allotted and assigned to settlers in severalty, and settlements were formed without any previous survey of the territory; and towns, as settlements, were taxed, and vested by general acts with powers, which in effect made them corporations, but without bounds or limits. And the ancient records are full of orders, providing for the establishing of bounds between one town and another.

2. Another important consideration in putting a construction upon this grant is, that it was, in time, several years before the act usually known as the colony ordinance of 1641, though probably passed in 1647, by which " it is declared, that in all creeks, coves and other places about and upon salt water where the sea ebbs and flows, the proprietor or the land adjoining shall have propriety to the low water mark, where the sea doth not ebb above one hundred rods, and not more wheresoever it ebbs further." Anc. Chart. 148. For a full statement of the character and effect of this act, see *Commonwealth* v. *Alger*, 7 Cush. 67.

Under these views we come to consider the grant by the Colony in 1636, and ascertain its effect and operation. The

form of this act is as follows : " Ordered, that all the rest of the ground lyeing betwixt Dorchester bounds, and Boston bounds, shall belonge to the towne of Rocksbury, easterly of Charles Ryver (except the propriety of the aforesaid town which they purchased of particular persons) Rocksbury not to extend above eight myles in length from their meeting howse."

Supposing this to be a grant of property in land, by the Company, represented by the colonial government, then meeting and acting within the Colony of Massachusetts Bay, and having superseded the subordinate and temporary government of which Governor Endicott was the head, which had previously been authorized to appropriate and grant lands, the question is, what was the subject matter, what estate passed by this grant. When the boundaries, monuments and local objects, constituting the descriptive part of a grant, be it deed or record, are fixed by the evidence as matters of fact, the construction of such deed, its effect and operation, is a question of law.

These boundaries, abuttals and monuments are fully set forth, in the report, by reference to the acts and records, many of which are specified and enumerated in the report and others are generally referred to. The first named is " Dorchester bounds," that is, the bounds between Dorchester and the plantation or settlement called Roxbury, which the language of the order implies had been previously settled. Committees had been appointed, and surveys directed for that purpose ; it might be, and no doubt was, corrected afterwards. But it was assumed to be settled, and sufficiently accurate to stand as a boundary. It appears by the description and plans, that it was a line, extending up from Boston Harbor, between Boston proper and Dorchester Point, now South Boston, through what is now called the South Bay, and then run in a line designated, in a westerly direction, to the bounds of Dedham at Charles River.

The boundary expressed on the other side, being the northerly or northwesterly side, is " Boston bounds." By this term, it is manifest, was intended the line of a tract of land at Muddy River, now Brookline, which was assigned to the inhabitants of Boston as an enlargement of their limited territory. Its well

Commonwealth *v.* City of Roxbury.

established bounds, northerly and westerly, were Cambridge (now Brighton) and Newton. This settlement at Muddy River, at the time of the grant in question, was regarded and designated as part of Boston, and so remained half a century afterwards. In 1686, by an order of the president and council, the chartered government being then superseded, the inhabitants of Muddy River, then called a hamlet of Boston, were exempted from town rates to the town of Boston; they maintaining their own highways, poor and other public charges, arising amongst themselves, and annually meeting and choosing three men to manage their affairs.* In 1705, after the establishment of the provincial government, they were granted the powers and privileges of a township, to be called Brooklyn, provided that all common lands belonging to Boston should still remain to the proprietors of said lands. [*Ante*, 465, note.] At the time of this grant, therefore, " Boston Bounds," expressed in it, was the dividing line between Roxbury and the settlement at Muddy River, and nearly coincided with the present dividing line between Roxbury and Brookline, a line that formerly extended to Charles River, which was the easterly line of Dedham. It appears then by referring to the boundaries of the adjoining towns, and to the surveys and plans, that a part of Charles River, forming the easterly line of Dedham, is so situated that a line protracted in

---

* " At a Councill held in Boston, New England, December the 8th 1686.

" Joseph Dudley, Esqre, President.    William Stoughton, D. P.

" Wait Winthrop } Esqrs. Bartho. Gedney } Esqrs. Jonath. Tyng } Esqrs."
 Rich. Wharton           John Usher            Edward Randolph

" In answer to the petition of the Inhabitants of Muddy River, praying to have liberty to erect a schoole, &c. Upon hearing thereof, the President and Councill do Order, that henceforth the said Hamlet of Muddy River be free from town rates to the Towne of Boston, they maintaining there own high ways and poor, and other publick charges riseing amongst themselves, and that within one yeare next comeing they raise a schoole house in such place as the two next Justices of the County, upon a public hearing of the Inhabitants of the said Hamlet, shall determine, as also maintaine an able reading and writing master there, from and after that day, and that the Inhabitants annually meet to choose three men to mannage their affaires." Copies of Council Rec. 1686, fol. 94, 97, in Office of Secretary of Commonwealth.

a westerly or southwesterly direction would strike it, and that the bounds of Dorchester, on the southerly side, did strike it.

Here are then two side lines, as well defined as the nature of surveying at that time admitted, and both in fact extending from the seaboard to the interior, towards Charles River. We are then to look for the residue of the description, " all the rest of the ground lying betwixt Dorchester bounds and Boston bounds, easterly of Charles River, Roxbury not to extend above eight miles in length from their meeting-house."

At that period, it was a common practice, in establishing the bounds of the front range of towns on the seaboard, to extend them eight miles into the interior. In 1635–6 it was ordered that Charlestown bounds shall run eight miles into the country, from their meeting-house, if no other bounds intercept. 1 Mass. Col. Rec. 168. So Watertown is to run till it be eight miles from their meeting-house. 1 Mass. Col. Rec. 257. Other instances might be named.

When, having fixed side lines, which if protracted would extend to Charles River, the grant says " all the rest of the ground, lying betwixte " those two lines, " easterly of Charles River ; " if unlimited, it would obviously make that part of Charles River the westerly boundary. But the grant was not unlimited ; it was qualified by the limitation, that it should not extend above eight miles from the meeting-house. The distance was probably unknown, it might be six or seven, or perhaps nine or ten miles. A specific limit was therefore inserted in terms. The word " rest " or residue " of the ground," &c., implies that part of the land, then known as the town or plantation of Roxbury, perhaps a large part, had been previously taken up by settlers entitled, or granted out by the provisional government under Endicott. The lands thus granted and settled would naturally be those near the seaboard, and the village be formed so that the lands in the interior would be those remaining longest ungranted and unsettled. Indeed there was an order of the government, previous to this grant, that no dwelling-house should be built above half a mile from the meeting-house in any new plantation, without leave from the court. 1 Mass. Col. Rec. 157.

It appears to us therefore, that this last clause describes, in an alternative form, the westerly line of the intended grant, and that it embraced all the remaining interest of the government in the ungranted and unsettled lands, in remoter parts of the plantation lying between the two fixed lines described, and extending westwardly to Charles River, if it should be found not to exceed eight miles from the meeting-house, and, if it should exceed eight miles, then by a straight line drawn across from one of those to the other at the distance of eight miles.

This construction gives effect to all the words of the grant; but upon any other view, if the term " Charles River " as used in the grant, does not mean that part of Charles River lying next to Dedham, and used in the alternative as one of the bounds of the grant, then the grant has no westerly bound whatever. A circumstance which confirms this construction is this: It was testified on the trial that from the meeting-house, which, it is agreed, stood where the present meeting-house now stands, the distance was between seven and eight miles, that is, less than eight miles. And by a subsequent colonial order, in 1638, it was directed " that the town of Roxbury shall have four thousand acres of land, where it may be laid out without prejudice to any plantation or former grants, because Dedham doth shorten them." 1 Mass. Col. Rec. 220. This indicates that Roxbury did not get its full eight miles, and therefore Charles River, being the line of Dedham, did in fact constitute the westerly boundary of this grant, by that branch of the alternative which makes Charles River, if within eight miles, the boundary.

Suppose this colonial act then to be a grant, with well defined boundaries on three sides, but no expressed boundary on a fourth side; a deed is not to be held void for uncertainty because the boundaries are not fully expressed, when by reasonable intendment it can be ascertained what was considered and understood by both parties to be embraced, and intended to be embraced in the description. The obvious and legal course, we think, is to lay down a plan on the land, according to ascertained boundaries, abuttals and monuments, on these three sides,

and thus see where the fourth would come; if it terminate on the sea or salt water, on a highway or public common, or on a well established line of private property, such deficient line will be supplied by necessary intendment, and the instrument be read as if it were so expressed. This rule is essential, and has been constantly adopted in the legal construction of the brief and inartificial grants, deeds and other forms of conveyance, in use at the early period when this colonial grant was made.

But the result, it appears to us, would not have been different, if we are mistaken in supposing that by the name " Charles River," as expressed in the ordinance, was intended that part of Charles River at the interior and most remote part of the granted territory; and that by the term " Charles River " was intended what is now known as the Back Bay, being a widening or enlargement of Charles River, and intended to be the eastern or northeastern boundary of the grant. This bay was then, still is in part, though affected by the Milldam, an arm of the sea, in which the tide ebbs and flows; and the law, as it then stood, carried the public right in the sea and sea shores to the ordinary high water line of the flow of the tide; and as, in the case supposed, the river was the boundary of the grant, and high water mark the limit of private ownership, the flats in question could not be included in or pass by it.

But even if the colonial act in question had been passed after the ordinance of 1641, extending a qualified right of the soil of riparian owners, to the extent of an hundred rods, and the grant had been bounded, in express terms, or by necessary intendment, on the sea, it would have carried the right of the grantee to one hundred rods only below the ordinary high water line, and would not have included the flats in question, which are beyond one hundred rods.

We lay no great stress on the use of the word " ground " instead of land; though by the term " rest of the ground," where lands had been granted for cultivation and settlement, it could be hardly contended that land flowed by tide water was intended, without some context or qualifying word of description indicating such an intent.

3. But it is argued and insisted in behalf of the defendants, that as the colonial government was at the time of the grant vested with the right of ownership in the soil, and also, as an incident thereto, with the right of government, with a prerogative right and interest in the soil of the sea, sea shores and arms of the sea, the government of the Colony had power to grant an interest in flats, as well as in upland; and the bounds of this grant being indefinite towards the tide water in the Back Bay or Charles River, the deed is to be taken most strongly against the grantors, and it must be presumed that they intended, when not limited in terms, to convey all which they had the power to convey.

But we think the argument does not apply. In the first place, the ordinary technical rule of presumption, that words are to be taken most strongly against the grantor, has no application. The colonial government stood in two relations to its subjects: first, as owners of the land, to be granted to settlers and purchasers, to be held in severalty in fee; and secondly, as incident to the powers of government, they held a prerogative right to the sea and sea shores, in a fiduciary relation, for the public use. As a general rule, in all grants from the government to the subject, the terms of the grant are to be taken most strongly against the grantee, and in favor of the grantor — reversing the common rule as between individuals — on the ground that the grant is supposed to be made at the solicitation of the grantee, and the form and terms of the particular instrument of grant prepared by him, and submitted to the government for its allowance. But this rule applies *a fortiori* to a case where such grant by a government to individual proprietors is claimed to be not merely a conveyance of title to land, but also of a portion of that public domain, which the government held in a fiduciary relation, for general and public use. This rule, with its necessary qualifications, is well stated in the opinion of Mr. Chief Justice Taney in *Martin* v. *Waddell*, 16 Pet. 411. That case is of the highest authority and directly in point as to the application of the legal maxim.

But secondly, where a body like the colonial government

holds two distinct powers, one for granting and distributing lands to parties entitled, for settlement in perpetuity, and of which power it is in the habitual and constant exercise, as one of the ordinary and prominent purposes of its establishment and at the same time has a fiduciary interest and authority over the public domain; the grant, whilst it conveys the land embraced in it, will not be held to include any portion of such public right, unless it is included in its terms, by express words or necessary implication.

In the construction of a grant, the court will take into consideration the circumstances attending the transaction, the situation of the parties, the state of the country, and of the thing granted, at the time, in order to ascertain the intent of the parties. *Adams* v. *Frothingham*, 3 Mass. 352. In that case, a grant from the town of Newbury to Noyes in 1680, on an arm of the sea, indefinite in its direction towards the channel, was held to intend a conveyance to low water mark, being within one hundred rods, because the ordinance of 1641 had then so extended the right of the town to the upland owners, as to make the flats to that extent their private property.

So in other states, where the same rule of the common law existed, it was held that by the king's charter the right of property vested in the colony, and as superadded thereto, the right of government, and, as incident to this, the *jus publicum* over sea shores and tide waters; but where no such law as the Colony ordinance of Massachusetts of 1641 was ever adopted, it has been decided that a grant of lands lying on the sea shore or an arm of the sea will not convey land beyond high water mark. As where the government of Connecticut in 1685 confirmed to proprietors, who had purchased of the Indians, lands including an arm of the sea, and with all ports, rivers, &c., it was held not to be a grant of the soil between high and low water mark. *East Haven* v. *Hemingway*, 7 Conn. 186. *Middletown* v. *Sage*, 8 Conn. 221. In New York it has been decided, that no exclusive right, adverse to that of the sovereign and public right, in the soil of the shore below high water mark, can be acquired by a town, by the operation of an act of the legislature, extend-

ing the limits of such town over such waters. Such act may give jurisdiction, but no right of property in the soil. *Palmer* v. *Hicks*, 6 Johns. 133. Similar decisions are to be found in some of the other maritime states.

The distinction, above alluded to, between the right of property and the right of jurisdiction, in the towns in this commonwealth, is of great importance. Counties are composed of towns. And for many purposes, the body of the county extends not only over the shores of the sea, but to some distance below the ebb of the tide, for many purposes of civil and criminal proceedings, and for certain purposes of jurisdiction ; and, for the like purposes, towns may be considered as having a coextensive jurisdiction ; but this has no bearing upon the question of property. An act of incorporation therefore, without words of grant of the soil, would vest no part of the property of the government in such town. Nor was the purpose of the organization of such a nature, as would require of the government any portion of the public right vested in them for public use and benefit, therefore no portion of the *jus publicum* will be presumed to have been granted, without express words. On the contrary, it was held in an early case in Massachusetts, that towns, in virtue of their authority to lay out town ways, cannot exercise that jurisdiction over lands between high water and low water mark, although plainly within their territorial limits and jurisdiction, and that a town had no authority by its surveyors to enter on flats to abate a nuisance. *Austin* v. *Carter*, 1 Mass. 231. Courts of sessions and county commissioners, under a general authority to lay out highways, cannot lay them over tide waters, without special authority from the legislature. This, we think, is founded on, and affirms the principle, that an authority granted by the government to take land for highways, general in its terms, will not be construed to authorize like powers to be exercised over flats formed by navigable waters, unless such power appear by express words or necessary implication. *Commonwealth* v. *Coombs*, 2 Mass. 489. *Arundel* v. *McCulloch*, 10 Mass. 70. The legislature alone have that power. *Charlestown* v. *County Commissioners*, 3 Met. 202.

*Kean* v. *Stetson,* 5 Pick. 492. *Marblehead* v. *County Commissioners,* 5 Gray, 451.

But it appears, that as early as the grant in question, and before the ordinance of 1641, declaring the right of all persons bordering upon tide water, to have a qualified and limited right of flats, the Colony government, when they intended to grant a right of flats, did it in express terms. By an order passed in March 1636, Noddle's Island was granted to Boston, in the briefest possible terms, without limit or qualification. 1 Mass. Col. Rec. 189. At a meeting of the governor, assistants and a large number of deputies, in May 1640, this order was passed: "It is declared that the flats round about Noddle's Island do belong to Noddle's Island, to the ordinary low water mark." 1 Mass. Col. Rec. 291. By the grant of the island, without qualification, the whole island passed. Under the ordinary maxim that words are to be construed most strongly against the grantor, and the presumption that all passed which the grantor could convey, the flats would have passed by the first act. But the second order shows, that it was not so understood by the parties; and in order to give title to the flats, the second grant was necessary.

4. Again; the inquiry strongly impresses itself on our minds, if the grant to Roxbury, regarded either as a grant to a corporation, or to the proprietors as tenants in common by an aggregate name, carries with it a title to all the grounds over which the tide flowed; why would not the same be true in regard to every other maritime town in the Colony? They all derived their titles from the government. Either grants were made in severalty to a considerable number of settlers, who were afterwards recognized as a plantation, settlement or town by a proper name, vested by general laws with certain powers, and afterwards had their bounds declared; or, at a much later period, grants were made to a company of individuals named, of a tract of land, with the view to constituting a town afterwards. In either case, their rights and powers, both of soil and jurisdiction, would seem to be the same with those of Roxbury; and yet we know of no instance of any claim made by any municipal cor-

poration or proprietary to flats below high water mark, before the Colony-ordinance of 1641, or beyond the line of riparian proprietorship, since the passage of that ordinance.

Again; if the argument be sound, that because the government had power to alienate the public domain, it must be presumed that they intended so to convey it, unless expressly limited, why should the grant be limited to the channel or line of low water? for the right of the public and the power of the government to control and appropriate the same beyond low water, was the same. In its application to the grant in question, this construction would extend the grant of soil to the town of Roxbury, not only to the channel of Charles River, but to the bed of the channel and the flats beyond, quite to the shores of Charlestown and part of Boston, which cannot plausibly be pretended.

In this view of the rules of the common law, here adopted from the earliest settlement, of the state of the country, of the date of the grant, of its obvious intent, we come to the construction of this grant. Roxbury was not a corporation in the sense in which we now understand the nature of a corporation, but was a plantation or settlement of proprietors, who had received grants of land, living near each other, which settlement had acquired a name; the grant was made to those settlers, for the enlargement of their estates; but, like other grants to proprietors as an aggregate body, but not strictly a corporation, it must be held to communicate some limited corporate powers sufficient to enable them, as a proprietary, to manage, divide and alienate its property amongst themselves, or grant them to new comers. It was in these words:

" Ordered, That the rest of the ground lying betwixt Boston bounds and Dorchester bounds shall belong to the town of Roxbury easterly of Charles River, (except the propriety of the aforesaid town, which they have purchased of particular persons,) Roxbury not to extend above eight miles in length from their meeting-house."

In putting a legal construction upon this grant, we are unable to concur in the conclusion to which the arbitrator came. We

are of opinion that it did not pass to the grantees any right, title or interest in the soil of the flats of Charles River or the Back Bay, below the line of ordinary high water mark; and of course they could acquire no title to flats lying more than one hundred rods seaward below such high water line.

If there is no intelligible description of limits in this grant, it must be held void for uncertainty, and convey nothing, which would be subversive of the title of the defendants, who claim under it. We should hesitate long before putting this construction on a grant made at so early a period and under such circumstances, and would adopt it only as a last resort, when all other means had failed, which, for reasons already given, we think is not necessary. There is no local or descriptive term in the grant, which has the appearance of being a northeasterly boundary, except Charles River, which we have supposed was not used for that purpose. The actual boundary, on that side, was in part only on Charles River and the Back Bay. The grant was of all the ground between Dorchester bounds and Boston bounds; and therefore land bordering on the South Bay, between Dorchester and Boston proper, as well as that on the west side, between Boston proper and the old Boston bounds at Muddy River, constituted the actual northeastern side of this grant on tide water. The name " Charles River " would be wholly inapplicable to that line. But if we could go so far as to presume a mistake of the terms of the description, and instead of " easterly of Charles River," it had been " easterly on Charles River," and even added, " and the South Bay;" if the terms " Charles River or Back Bay," and " South Bay," as they are now understood, had been used, both being then as now arms of the sea, the grant could not by law extend beyond the ordinary high water line. If we supply the deficient description, by substituting these words as being, by a reasonable intendment, what the parties understood — and something must be supplied to give effect to the grant — the result must be the same.

If indeed the same grant, in the same terms, had been made after the Colony ordinance of 1641 or 1647, it would have car-

ried the flats to the extent of one hundred rods, not because the description would have been more comprehensive, but because, when by reasonable intendment the deficient description is supplied by limiting it to the sea, or sea shore, then the law annexing a qualified right of flats to the upland propriety thus granted, the flats would have passed as an appendance. But this would have carried the right one hundred rods only, and would not have included those flats beyond one hundred rods. It may be added in this connection, that if this grant preceded the colony ordinance, when that ordinance did pass, it annexed the flats to the upland; if the town were then owners of any portion of the shore, it would have enured to their benefit; if it was held by private proprietors, either derivatively from the town, or by original direct grants from the colonial government, it would have enured to their benefit respectively.

In any possible view in which we can place this act of the colonial legislature, we are of opinion that it did not convey to the town of Roxbury the premises now in controversy; but the title remained, as it was before, in the Colony.

That the construction of statutes, wills, deeds and other instruments of conveyance, when the facts of locality and description are ascertained, is a matter of law, is a position well established. We will cite one case only, but one of high authority, which marks the distinction with great precision and clearness.

In *Macbeath* v. *Haldimand,* 1 T. R. 172, it was contended that the effect and meaning of certain letters, respecting a contract for public supplies, was matter of law. All the judges expressed an opinion, that being written instruments, the construction was matter of law for the court. But Mr. Justice Buller stated the general rule and its limitations with great accuracy, thus: " If letters be written in so dubious a manner, as to be capable of different constructions, and can be explained by other transactions, the whole must be left to the jury; for they are to judge of the truth or falsehood of such collateral facts, which may vary the sense of the letters themselves; but if they be not explained by any other circumstances, then like deeds or other

written agreements, the construction of them is a mere matter of law." The facts in that case were altogether different, and it is cited only as a clear and authoritative statement of the settled rule of law, that the construction of all written documents, when the facts are proved, on which their meaning depends, is a question of law for the court.

II. The next question mentioned in the report is thus stated : " It was contended by the defendants' counsel, that the exclusion of the tide water from the empty basin, by authority of the act of June 14th 1814 and subsequent acts of legislation, vested in the adjoining owners all the land thus made bare, or at any rate operated as an extinguishment of all rights of the Commonwealth. But I was of opinion that neither the act of 1814 and proceedings under it, nor any other acts of the government, divested the Commonwealth of any right or title which it had in the premises."

We fully concur with the referee in this opinion. But as the question has again been raised and argued before us, it seems proper to state some of the reasons on which our opinion is founded, especially as no reasons are given in the report.

The act of 1814 simply confers on the corporation thereby created an authority, a privilege or franchise, to exclude the tide waters from the empty basin, and to use it as a receiving basin, for the purpose of mill power. There are no words of grant of soil, nor anything which implies it. The most which it can be construed to confer on the corporation is an easement, a franchise, an incorporeal hereditament, leaving the title unaffected. The view taken of it by the court, in the case of *Boston & Roxbury Mill Corporation* v. *Newman,* 12 Pick. 476, was, that before this act passed " the owners of the upland owned the flats to the extent of one hundred rods. The Commonwealth had the title to the flats beyond. So far as it regarded the right of the public, the corporation acquired it by the act of the legislature. But the flats between the upland and those belonging to the Commonwealth must be subjected to the control of the corporation, or they could not carry their undertaking into effect." The " right " of the public ; what was the right ? The subsequent

clause, we think, explains it; it was subjected, like that of other owners, to the control of the corporation. It was a perpetual right to use it, for flowage only, and not for building. It is an easement, not a title. But secondly, if it made any grant, it was to the corporation and not to riparian proprietors, or any other party. No other party can set it up to defeat or extinguish the right of the Commonwealth. Thirdly, no reservation or exception of the right of the Commonwealth to the soil was necessary, because the soil was not granted, but remained as if no such grant had been made.

It is true that, after this act, the Commonwealth could make no beneficial use of the title in fee, for building or the like; but the corporation could make no other use of their easement, or right of flowage, without the consent of the government; but the government and the corporation, by reuniting the fee of the soil and all easements and franchises over it, have power to give a good title for all purposes, and this can in no respect enlarge or diminish the rights of the defendants.

III. The next question suggested in the award embraces the matter contained in the four next paragraphs of the report.

The defendants' counsel contended that because the flats in question were described to be within the limits of Roxbury, they were, " by virtue of the original settlement of the town and the act of 1636, necessarily the property of the town."

We do not know precisely what is intended here, by " the original settlement; " if any act of the government is intended, we know of none. It is believed that no formal act of incorporation of any town was passed during the existence of the Colonial government. Roxbury was recognized as a settlement, and, as we have seen, assessed as such in 1630, and so remained to the time of the grant in question. But even an act of incorporation, without an express grant of the lands within it, would not, in our judgment, effect a transfer of the public lands. Such an act, with limited bounds, would pass municipal jurisdiction, but not soil. There was a practice, we believe, at a much later time, after the establishment of the provincial government by the Charter of 1692, to grant a tract of

ιand or township of land to a body of individuals named, con-stituting them proprietors and tenants in common, with a view to their incorporation afterwards as a town. But then they took the fee in the land, by force of the first grant, and not by force of the act of incorporation, when one passed.

It is further contended, in two or three different forms, that the agreement of Boston and Roxbury in 1823, and the statute of 1836 affirming it, were evidence bearing upon the question of property. But we fully concur with the referee in his con-clusion, that these acts can have no such effect; and for the unanswerable reason assigned by him, that Roxbury and Bos-ton could by no acts of theirs, however formal, impair or affect the rights of the Commonwealth; and the *St.* of 1836, *c.* 37, does nothing more than establish the lines as they have been mutually agreed on, as the boundary lines between said city and town.

The only plausible argument drawn from this statute is upon the use of the word "territory," in the last clause, which is as follows : " And the territory and jurisdiction on either side of the said lines as hereby established are accordingly confirmed to the said city and said town respectively." In our judgment, this clause affects jurisdiction only. It creates no new title; it con-fers no new rights; it gives the authoritative effect of law to a line before uncertain. The term " territory " was properly used ; it fixes the civil and political rights of all those who may build houses and become inhabitants on the one or the other side of this line. It has no bearing upon the question of property.

We would add here, in general terms, in regard to a great mass of evidence made part of the case, that all the early acts fixing boundaries between towns, all the perambulations of lines made by selectmen and recorded in town books, have no ten-dency to prove or disprove title; they affect the question of jurisdiction only, and for the purpose of the present inquiry may be laid out of the case.

It may be added, as to the earlier acts of the Colony, fixing boundaries, they merely affect the rights of the respective towns, unless there be some records of grant by the government,

and as to all these perambulations, that they are to ascertain and mark boundaries, and not to alter or vary them ; and as to the Commonwealth they are *res inter alios* and cannot affect its rights.

IV. The only other question is that of disseisin, all the evi dence respecting which is reported.

We are entirely satisfied that the defendants acquired no titl by disseisin, and on this point fully concur with the referee.

V. In considering what is the proper judgment to be rendereᴅ in this case, we are necessarily referred to the submission, which is rather peculiar, and the award made under it.

It seems to have been the desire and purpose of the parties to make the award conclusive, and by the combined action of the arbitrator, and of this court, to effect a speedy decision of all questions of law and fact, on which their contested rights de- pended, and to render the judgment upon them final. The case was referred to a learned and eminent jurist of much judicial experience, under an agreement that the pleadings might be so amended, if need be, as to embrace all the conflicting claims, rights and interests of the parties, embraced in a resolve speci- fied, and with a provision that the referee should report all questions of law arising in the cause to the court, for review and final adjudication — meaning, that the referee should award and determine the whole cause, including the law and the facts, but subject to the review and final adjudication of all matters of law in the cause by the full court. The referee has made his award accordingly, admitting all the evidence offered on both sides, whether objected to or not, subject to the opinion of the whole court as to its competency and relevancy. The evi- dence upon the main question is mostly documentary, with reference to fixed localities. All the evidence in regard to pos- session is reported. He also reports, that in his opinion the title to the flats in question is in the Commonwealth, unless it has been alienated by the government or by one of its predecessors. No such act of alienation or grant is relied on or given in evi- dence to effect such alienation, except the Colony ordinance of 1636. The referee was of opinion that this act did operate

as such alienation in favor of the defendants. But we are of opinion, that upon the facts shown and referred to in the report, the construction of this ordinance was a question of law, and upon that question this court is of opinion that that act did not effect such alienation, and therefore that the title still remains in the Commonwealth, concurring in all other respects with the referee.

The judgment, we think, may be something in the following form: Report of the referee read and accepted, subject to the opinion of the whole court in matters of law; the court are of opinion in point of law, that the grant from the colonial government to the town of Roxbury, in 1636, did not include any land bordering on the sea or tide waters, below ordinary high water mark, and therefore that judgment for the title and possession of the demanded premises be entered for the Commonwealth. *Judgment for the Commonwealth.*

NOTE. By "the Great Patent of New England," as it is generally called, James I. on the 3d of November 1620 granted to "the council established at Plymouth in the county of Devon, for the planting, ruling, ordering and governing of New England in America," and to their successors and assigns forever, "all that circuit, continent, precincts and limitts in America, lying and being in breadth from fourty degrees of northerly latitude from the equinoctiall line, to fourty eight degrees of the said northerly latitude, and in length by all the breadth aforesaid throughout the maine land from sea to sea, with all the seas, rivers, islands, creekes, inletts, ports and havens," and "together also with the firme lands, soyles, grounds, havens, ports, rivers, waters, fishings, mines, and mineralls, as well royall mines of gold and silver, as other mines and mineralls, precious stones, quarries, and all and singular other commodities, jurisdictions, royalties, priveliges, franchises, and preheminences, both within the same tract of land upon the maine, as also within the said islands and seas adjoining;" "not actually possessed or inhabited by any other christian prince or estate," nor within the limits of the Southern Colony, previously granted. 1 Hazard's Hist. Coll. 105, 111; Plym. Col. Laws, (ed. 1836,) 3, 10. 3 Archæol. Amer. xii–xv.

On the 19th of March 1627-8 this council granted to Sir Henry Roswell, Sir John Yonge, Thomas Southcott, John Humphrey, John Endicott and Simon Whetcombe, their heirs and assigns, and their associates forever all that part of New England extending from three miles north of every part of the Merrimack River to three miles south of every part of the Charles River and from the Atlantick to "the South Sea," and all lands, waters, fishings and mines, all islands lying on the coasts, and "all jurisdictions, rights, royalties, liberties, freedoms.

immunities, privileges, franchises, preëminencies and commodities whatsoever which they the said council established at Plymouth" had. The original of this grant is not known to be in existence, but it is recited in the Royal Charter of the following year, as a mere transition step towards which it was probably taken, and which is a firmer basis of the subsequent government of the Colony than this grant. 1 Mass. Col. Rec. 4, 5; Anc. Chart. 3. 1 Palfrey's Hist. N. E. 290 notes, 308 note. Opinion of Chief Justices Rainsford and North in 1677, 1 Belknap's Hist. N. H. Appendix, xxxiv. 1 Hutchinson's Hist. Mass. (3d ed.) 16, 17. Bradford's Hist. Plym. 250, 251, Deane's note. 1 Bancroft's Hist. U. S. 321, 408. *Commonwealth* v. *Charlestown*, 1 Pick. 183. *Commonwealth* v. *Alger*, 7 Cush. 65, 66. *Commonwealth* v. *Roxbury, ante*, 479, 480.

The six patentees named in this grant acted in behalf of a large number of others. Endicott was the only patentee who came over at that time; and none of the others except Humphrey ever came at all. 3 Archæol. Amer. xlvi, lii. John White, the minister, (called in Fuller's Worthies " the father of the Massachusetts Colony,") wrote in 1630 that after the unsuccessful attempt to found a colony at Cape Ann, and the return to England of most of those adventurers, " the business came to agitation afresh in London," and " some men shewing some good affection to the worke, and offering the help of their purses, if fit men might be procured to goe over, enquiry was made whither any would be willing to engage their persons in the voyage; by this enquiry it fell out that among others they lighted at last on Master Endecott, a man well knowne to divers persons of good note; who manifested much willingnesse to accept the offer as soone as it was tendered; which gave great encouragement to such as were upon the point of resolution to set on this worke of erecting a new colony upon the old foundation." White's Planters' Plea, *c.* 9, p. 43, in 2 Force's Hist. Tracts. 3 Archæol. Amer. xx, xxvi, 2.

Endicott sailed on the 20th of June, and arrived at Salem on the 6th of September 1628. 3 Archæol. Amer. lii, 8. Hutchinson, who wrote with Endicott's instructions from his associates before him, says that " all the affairs of the Colony were committed to his care." 1 Hutchinson's Hist. Mass. 16. The first entries in the first volume of the Massachusetts Colony Records consist of a list, made before Endicott sailed, of the supplies for his expedition, followed by a second list entitled " To provide to send for Newe England," in which the religious instruction and the civil organization of the Colony stand first, viz. : " Ministers. Pattent under seale. A seale." 3 Archæol. Amer. 1–7. 1 Mass. Col. Rec. 23, 25. 1 Palfrey's Hist. N. E. 289, note. Before a charter was obtained, Matthew Cradock, on the 16th of February 1628–9, wrote " in the behalf of our whole company (which are much inlarged since your departure out of England) " to Endicott, acknowledging advices of his arrival. 3 Archæol. Amer. 8; 1 Mass. Col. Rec. 383.

The Colony Charter granted and confirmed to these six patentees and twenty associates the same territory as the grant of 1628 from the Plymouth Company, yielding and paying therefor to the King the fifth part of the gold and silver ore

there obtained; and constituted them " one body corporate and politique in fact and in name by the name of the Governor and Company of the Mattachusetts Bay in Newe England," with full powers of government, including the " setling of the formes and ceremonies of government and magistracy fitt and necessary for the said plantation and the inhabitants there, and for nameing and stiling of all sortes of officers, both superior and inferior, which they shall finde needfull for that governement and plantation, and the distinguishing and setting forth of the severall duties, powers and lymitts of every such office and place," and the forms of their oaths, and " the disposing and ordering of the elections of such of the said officers as shall be annuall, and of such others as shall be to succeede in case of death or removall;" and provided that " theis our letters patents or the duplicate or exemplification thereof shalbe to all and everie such officers, superior and inferior," a sufficient warrant; and that " all and everie such chiefe commaunders, captaines, governors, and other officers and ministers " as should be employed by the Governor and Company, " either in the government of the saide inhabitants and plantation, or in the waye by sea thither or from thence, according to the natures and lymitts of their offices and places respectively," should " have full and absolute power and authoritie to correct, punishe, pardon, governe and rule " all English subjects inhabiting the said plantation, or voyaging thither or from thence, according to the orders, laws and instructions of the Company. 1 Mass. Col. Rec. 5–17; Anc. Chart. 4–15.

This charter was obtained on the 4th of March 1628–9; and Cradock, who was named therein as governor of the Company, took the oaths as such on the 18th, and the deputy governor and assistants were sworn on the 23d of March. 1 Mass. Col. Rec. 19, 37 *a.* On the 6th of April 1629, the Company appointed committees " for making orders and power for meet government of New England, to write letters to Captaine Endicott, to order divisions of land and whatsoever may concerne the Companyes affayres," and, among other things, " to gett the exemplification of the Letters Patents." 1 Mass. Col. Rec. 37 *e;* 3 Archæol. Amer. 30 *a.* A letter to Endicott and his council was accordingly written on the 17th of April, and approved by the Company on the 27th. 1 Mass. Col. Rec. 37 *i*, 386; 3 Archæol. Amer. 30 *e*, 30 *f*, 79. Meanwhile, on the 8th of April, the Company had required Ralph Smith, as a condition of being permitted to go out, to bind himself " not to exercise the ministery within the lymitts of our plantation, neither publique nor private, without the consent and approbation of the government there established by us," and " to submit to such orders as shall be there established." 1 Mass. Col. Rec. 37 *f*, 390; 3 Archæol. Amer. 30 *b*, 30 *c*, 85.

The Company's letter informed Endicott that they had " confirmed " him governor of their plantation, and had provided a council for him, of whom the old planters might choose two, " in that wee would have their consent (if it may bee) in making wholesome constitutions for government; " and committed the settlement of the claims of John Oldham to the discretion of Endicott and his council, warning them that " the preservation of our priviledges will chiefly depend (un

der God) upon the first foundation of our government." This letter was accompanied by duplicates of the Charter and seal of the Company; and suggested to Endicott to " publish a proclamation " to prevent injuries to the Indians, " by leaving it fixed under the Companye's seale in some eminent place, for all to take notice." 1 Mass. Col. Rec. 386, 387, 389, 393, 394, 396; 3 Archæol. Amer. 79, 80, 84, 87, 89, 93.

The first formal election, however, of a governor and council for the Colony appears to have been made on the 30th of April 1629, when the Company " thought fitt to settle and establish an absolute government at our plantation in the said Mattachusetts Bay in New England," to consist of thirteen persons " resydent upon the said plantation," who should " from tyme to tyme, and at all tyme hereafter, have the sole managing and ordering of the government and our affairs there," and " bee entytled by the name of the Governor and Councell of London's Plantation in the Mattachusetts Bay in New England; " " chose and elected the said Captaine John Endicott to the place of present governor in our said plantation " for one year after he should take his oath of office, (which was sent out to be administered to him in New England,) or until the Company should choose a successor; and authorized him and his council, or a majority of them, to fill vacancies in their board, and to elect a deputy governor, secretary and other officers. This order was confirmed on the 18th of May. 3 Archæol. Amer. 30 f, 30 g, 34, 38, 39; 1 Mass. Col. Rec. 37 j, 42, 361, 362.

The Company at the same time ordered (in the same words in which the lawmaking power had been conferred by the Colony Charter on the governor and general court, and nearly the same in which it was afterwards conferred on the legislature by the Province Charter and by the Constitution of the Commonwealth) that Endicott and his council should " have full power and authority to make, ordeyne and establish all manner of wholsome and resonable orders, laws, statuts, ordinances, directions and instructyons, not contrary to the lawes of the relme of England," adding, " for the present goverment of our plantation, and the inhabitants residinge within the lymitts of our plantation ; a copy of all which orders is from tyme to tyme to bee sent the Company in England." 3 Archæol. Amer. 30 h, 40; 1 Mass. Col. Rec. 38, 363; Anc. Chart. 32, 33. Const. Mass. c. 1, § 1, art. 4.

These orders, and others giving general directions for the allotment of lands, were sent out to Governor Endicott and his council with a letter of May 28th. 1 Mass. Col. Rec. 44, 45, 398 & seq.; 3 Archæol. Amer. 37 & note, 96 & seq. As no records of Endicott's administration have been preserved, there is no direct evidence of the required oaths having been taken by him or his councillors. But it appears that he held councils and elections, made laws, granted lands and regulated the civil and religious affairs of the Colony. Bradford's Hist. Plym. 265, 266. N. Morton's New England Memorial (ed. 1826) 137, 147, 148. T. Morton's New English Canaan, 105, in 2 Force's Hist. Tracts. Edward Howes to John Winthrop, Jr., March 25th 1633, 29 Mass. Hist. Coll. 257. Hubbard's Hist. N. E. 104, 109, 114, 115, 122. 1 Mather's Magnalia, 18. Prince's N E. Chronol

(ed. 1826) 260, 262. 1 Chalmers Amer. Col. 42. 3 Archæol. Amer. 52–54, note. 1 Mass. Col. Rec. 81, 408. Frothingham's Hist. Charlestown, 13, 21. 1 Palfrey's Hist. N. E. 294–299, 320. *Commonwealth* v. *Roxbury, ante,* 485, 489.

The right of the Company under the Charter to make this delegation of power has not been disputed, even by those who have doubted the validity of the subsequent transfer of the Company to America. 1 Hutchinson's Hist. Mass. 20, 366. 1 Chalmers Annals, 142. But it can hardly be supposed that the Company could or would surrender the whole legislative power to the government thus established by them in the Colony. Yet the form of the "oath of the governor in New England" (upon which Counsellor White's advice had been taken) omits the clause, which was in the oath of the governor of the Company, binding him to execute the statutes and ordinances of the Company, and simply says, "Statutes and ordinances shall you none make without the advice and consent of the councell for the government of the Mattachusetts Bay in New England." 1 Mass. Col. Rec. 39, 44, 349, 351, 399. 3 Archæol. Amer. 30 *h,* 36, 40, 96, 97. The Company do not seem after this to have passed any orders in England for the government of the Colony ; and the language used in their letters of instructions is rather that of suggestion than of command. 1 Mass. Col. Rec. 403, 405, 406, 407, 408. 3 Archæol. Amer. 54 note, 102, 105, 106, 107. Higginson and those who came over with him in 1629 "were all combined together into one body politicke under the same Governour." Higginson's New England Plantation (1629) 1 Mass. Hist. Coll. 123.

Some of the early narratives would lead us to suppose that the association had formed the purpose to come to America before they sent over Endicott. Johnson's Wonderworking Providence, *c.* 9, 12 Mass. Hist. Coll. 69. Hubbard's Hist. N. E. 109. But White, the earliest of all, says that "the good report of Captaine Endecott's government, and the encrease of the Colony, began to awaken the spirits of some persons of competent estates, not formerly engaged." Planter's Plea, 43, in 2 Force's Hist. Tracts. See also Governor Dudley's letter to the Countess of Lincoln, March 12th 1630–1, 8, Ibid. The first mention of the project in the records is under date of July 28th 1629, and is that Cradock, the governor of the Company, "read certain propositions conceived by himselfe," to wit, for reasons given, "to transferr the government of the plantation to those that shall inhabite there, and not to continue the same in subordination to the Company heere, as now it is ; " and after repeated discussions, it was voted on the 29th of August "that the government and pattent should bee setled in New England, and accordingly an order to bee drawne upp." 1 Mass. Col. Rec. 49–51 ; 3 Archæol. Amer. 47–49. 4 Savage's Geneal. Dict. 609. On the 16th of October, after the transfer had been decided upon, but before the details had been arranged, the Company wrote a letter to "the Governor, Captaine Endicott," in which they gave no hint of the proposed change — perhaps only because they had not determined what to say to him about it; for at that meeting it was "conceived fitt that Captaine Endecott continue the government there, unless just cause to the contrarie." 1 Mass. Col. Rec. 56, 57, 409 ; 3 Archæol. Amer. 54 note, 59.

At a general court held in London, on the 20th of October 1629, Governor Cradock, without formally resigning his office, "acquainted those present, that the espetiall occasion of summoninge this court was for the election of a new governor, deputie, and assistants, the government being to bee transferred into New England, according to the former order and resolution of the Company;" and John Winthrop (who had recently joined the Company, and with others signed an agreement on the 29th of August 1629 "to embarke for the said plantation by the first of March next," "provided always, that before the last of September next the whole government together with the patent for the said plantation be first by an order of court legally transferred and established to remain with us which shall inhabite upon the said plantation;") was "chosen to be governor for the ensuing yeare, to begin on this present day; who was pleased to accept thereof, and thereupon tooke the oath to that place appertaineing." And Cradock, Endicott and others were at the same time elected assistants. Hutchinson's Coll. 26. John Winthrop, Jr. to John Winthrop, August 21st 1629, 1 Winthrop's Hist. N. E. (3d ed.) Appendix, 432. 1 Mass. Col. Rec. 59, 60. 3 Archæol. Amer. xcix, 61–63 & note.

Winthrop sailed in the Arbella on the 29th of March 1630, arrived and was received by Endicott at Salem on the 12th of June. But his first official act in the Colony, so far as is known, (except the settlement of a difference between the captain and the passengers of another vessel,) was the marriage of his predecessor on the 18th of August. 1 Winthrop's Hist. N. E. 1–30. He may not have assumed the immediate government of the Colony sooner, because the year for which Endicott had been chosen had not expired; for, as above stated, Endicott had been chosen Governor of the Colony on the 30th of April 1629, for one year after he should take his oath of office and until a successor should be chosen; notice of this election did not leave England until the end of May; and to judge from the voyages of Endicott and Winthrop, the length of the passage was about three months, which would have brought him to about the middle of August 1629. But it has generally been assumed that Endicott's commission was superseded by Winthrop's arrival. 2 Winthrop's Hist. N. E. 25, Savage's note. 1 Felt's Annals of Salem, 157. *Shaw,* C. J., in *Commonwealth* v. *Roxbury, ante,* 487. And Winthrop was certainly known in the Colony from that time as "the Governor," and as such "entertained several publique persons;" while Endicott was called by the humbler title of "Captain," under which (either as the leader of the first band of colonists, or as having previously held military rank) he appears when first mentioned in the records, and which is used in the Charter, as a synonym, apparently, of "chief commander" or "governor" of the Colony by appointment of the Governor and Company. Bradford's Letter Book, 3 Mass. Hist. Coll. 74–76. Hubbard's Hist. N. E. 130, 131. 1 Mass. Col. Rec. 17, 25, 74. 1 N. E. Geneal. Reg. 203. *Ante,* 505.

By the Charter the time of the annual election of Governor of the Company was fixed on the last Wednesday of Easter term. Winthrop's election on the 29th of October 1629 was, somewhat irregularly, made for one full year from

that day. 1 Mass. Col. Rec. 12, 59. Edward Johnson states that on the 23d of August 1630 " the first court" was holden on board Winthrop's ship the Arbella, and that Winthrop was then " chosen governour for the remainder of that year 1630." Wonderworking Providence, c. 17, 12 Mass. Hist. Coll. 87. This, not appearing on the records of the Company (in which there is a blank leaf between the meetings in England and Winthrop's first court of assistants in the Colony) has been doubted by some of the best authorities. Prince's N. E. Chronol. 314. 1 Winthrop's Hist. N. E. 30, Savage's note. 4 Savage's Geneal. Dict. 609. 1 Palfrey's Hist. N. E. 317, note. And it is very possible that Johnson may have erroneously taken this date from the first court of assistants (which had no power by the Charter to elect a governor) at Charlestown. But, unless some unrecorded election was had during this summer, Winthrop acted without authority (at least after the expiration in October of the year for which he had in terms been chosen) until the regular annual election in May 1631 ; for the records contain no evidence of any intermediate election. 1 Mass. Col. Rec. 59–87. At Winthrop's second court of assistants, " Captaine Endicott, havinge beene formerly chosen an assistant," was sworn as such — whether under his election in England in the previous October, or under some intermediate election, such as is mentioned by Johnson, does not appear. 1 Mass. Col. Rec. 60, 75. The duplicate charter, under which Endicott governed the Colony before Winthrop's arrival, is still preserved at Salem in the Athenæum library. The Charter brought over by Winthrop is in the State House at Boston. In 1639 Cradock addressed Winthrop by the same title which had been conferred on Endicott ten years before, ante, 506. 36 Mass. Hist. Coll. 128.

In later times the legality of the transfer of the government of the Company in America has been doubted by some authorities. 1 Hutchinson's Hist. Mass. 363 note, 366, 367. 1 Chalmers Annals, 139, 148. Robertson's Hist. Amer. c. 10. 1 Grahame's Hist. U. S. (Amer. ed.) 222. 1 Story on U. S. Const. §§ 64, 66. But the step was taken after serious consideration, and under the advice of John White, the counsellor, by whom the Charter had probably been drafted. Johnson's Wonderworking Providence, c. 7, 12 Mass. Hist. Coll. 63. Prince's N. E. Chronol. 254. 1 Hutchinson's Hist. Mass. 20. 3 Archæol. Amer. cvi. 1 Palfrey's Hist. N. E. 306, 307. The Charter contained no limitation of the place of holding " general courts," or " courts of assistants; " and expressly provided that it should be lawful for the Company at any time, " to take, leade, carry and transport " to the Colony any English subjects, or any strangers that would become such, " not by especiall name restrayned " by the king ; and that the Charter should " be construed, reputed and adjudged in all cases most favorably on the behalf and for the benefitt and behoofe of the saide Governor and Company and their successors." 1 Mass. Col. Rec. 13, 14, 19 ; Anc. Chart. 11, 17. If the " copy of the docquet of the grant" quoted by Chalmers (1 Annals, 147) limited them to England, the omission of that restriction in the Charter certainly had no tendency to perpetuate it. In September 1630, December 1632 and January 1633, the privy council passed orders for the benefit

of the Company, with evident knowledge that the governor and the greater part of the assistants had left England. 1 Palfrey's Hist. N. E. 319 note, 365 & note. 3 Archæol. Amer. 50, note.

On the *quo warranto* brought by Sir John Banks as attorney general in 1635, service was made only upon the members remaining in England; and the judgment, rendered upon Matthew Cradock's default, was " that he should be convicted of the usurpation charged in the information, and that the liberties, privileges and franchises of the Company be seized into the king's hands." Hutchinson's Coll. 101–104 ; 1 Hazard's Hist. Coll. 101–104. This judgment was never treated, either in Massachusetts or in England, as a dissolution of the corporation. 1 Hutchinson's Hist. Mass. 89, 507. 1 Chalmers Annals, 162. 1 Palfrey's Hist. N. E. 403, 404, 556–559. In 1678 Sir William Jones and Sir Francis Winnington as attorney and solicitor general gave an opinion " that neither the *quo warranto* was so brought, nor the judgement thereupon so given, as could cause a dissolution of the said charter." 1 Chalmers Annals, 439. And see *The case of the City of London*, 8 Howell's State Trials, 1340 *& seq.* ; St. 2 W. & M. sess. 1, *c.* 8 ; 4 Mod. 58 ; 12 Mod. 17, 18 ; 1 Show. 278, 279, 280 ; Mass Hist. Soc. Proceedings 1859, 156–160.

In 1677 the two English chief justices, Rainsford and North, were of opinion that the Charter " made the adventurers a corporation upon the place." 1 Belknap's Hist. N. H. Appendix, xxxiv, xxxv. Sir William Jones, as attorney general, gave an opinion in 1679 upon the conflicting rights of the Massachusetts Colony, and of Mason, claiming under grants from the Council of Plymouth, in which he recognized that the Company " transported themselves and made a settlement upon the said lands" pursuant to the Charter ; and advised that Mason's claim to lands within their jurisdiction was subject to the colony statute of limitations of 1657, if passed by an assembly duly constituted according to the Charter ; and must be tried in the courts of the Colony, " liable to such appeal as the Charter allows, if it allows any." 1 Hutchinson's Hist. Mass. 284–287. 3 Mass. Col. Rec. 422. 4 Mass. Col. Rec. pt. I. 288. And Sir Robert Sawyer, his successor, (who obtained the judgment against the Charter in 1684 upon other grounds, and who was, as Mr. Hargrave says, " a great lawyer " and " in general an over devotee to the court and to prerogative,") gave an opinion that " the Patent having created the grantees, and their assigns, a body corporate, they might transfer their charter, and act in New England." 1 Chalmers Annals, 173. 32 Mass. Hist. Coll. 278. Pref. to Hale's Jurisdiction of the House of Lords, cxli, cxlii. And see 1 Bancroft's Hist. U. S. 345, 353 ; 3 Amer. Jurist, 238–241 ; *Commonwealth* v. *Alger*, 7 Cush. 66, 92, 93 ; *Commonwealth* v. *Roxbury, ante*, 480, 481.

Before the Colony Charter was obtained, " all men intendinge to goe in person or to send over " were required to sign an obligation " to bee tyed to such orders " for the division of lands in the Colony as should be agreed upon in England ; and within two months after obtaining the Charter, a scheme was adopted for such an allotment of the lands as to promote the building of towns. 1 Mass.

Col. Rec. 28, 43 ; 3 Archæol. Amer. 15, 35. *Commonwealth* v. *Roxbury, ante,* 484, 485. At Winthrop's second court of assistants, immediately following the order naming Boston, Dorchester and Watertown, cited *ante*, 485, " it is ordered that noe person shall plant in any place within the lymitts of this pattent without leave from the governor and assistants or the major parte of them," and those already settled at Agawam (afterwards Ipswich) were ordered to come away. 1 Mass. Col. Rec. 76. On the 22d of March 1630–1 the court of assistants ordered " every towne within this pattent" forthwith to provide arms for its inhabitants. 1 Mass. Col. Rec. 84. At first " the severall plantations" were repeatedly taxed as such by the court of assistants for public purposes. 1 Mass. Col. Rec. 77, 82, 89, 93, 103, 110. *Ante*, 459 note, 486. But on the 14th of May 1634 the powers of taxation and granting lands were declared to be in the general court only ; and the towns were directed how to levy taxes, and authorized to choose deputies. 1 Mass. Col. Rec. 117, 118, 120. *Ante*, 460 note, 480, 481. 28 Mass. Hist. Coll. 202, 203. Taxes were afterwards laid upon towns by the general court. 1 Mass. Col. Rec. 129, 138, 149, 158, 165, 175. In May 1631 and June 1635 the general court required every town to provide standard weights and measures. 1 Mass. Col. Rec. 87, 148. On the 3d of September 1634 a committee of nine was appointed, to " sett out the bounds of all townes not yet sett out or in difference betwixte any townes," and provision made for its pay. 1 Mass. Col. Rec. 125, 127. In 1634–5 towns were ordered to maintain the captains of their companies, and to provide powder houses. 1 Mass. Col. Rec. 127, 138. On the 3d of September 1635 " it is agreed that hereafter noe dwelling howse shalbe builte above halfe a myle from the meeteing howse, in any newe plantation." 1 Mass. Col. Rec. 157 ; *Ante*, 489. On the 3d of March 1635–6 towns were directed to send ten armed men each to the general court ; and were authorized " to demolishe howses," built " in any towne liberties, prejuditiall to the townes, without leave from the townes." 1 Mass. Col. Rec. 166, 168. And on the same day the order was passed, which is printed *ante*, 460, note, authorizing towns to grant lands, make by-laws and impose fines for their breach, and choose town officers. Similar orders were passed soon afterwards in the Plymouth Colony. 11 Plym. Col. Rec. 31–38 ; Plym. Col. Laws, (ed. 1836) 63–70. Towns were not expressly authorized to sue and be sued until 1694, nor formally incorporated until 1785. Prov. St. 6 W. & M., Anc. Chart. 279. *St.* 1785, *c.* 75, § 8. See 2 Dane Ab. 698 ; *Willard* v. *Newburyport*, 12 Pick. 229–231 ; *Spaulding* v. *Lowell*, 23 Pick. 77, 78 ; *Commonwealth* v. *Roxbury, ante*, 485, 495, 496, 500. The determination of the boundaries of towns, either by perambulation, by agreement between towns, or by the general court, did not affect the title to lands within their limits. *Porter* v. *Sullivan*, 7 Gray, 444, 450. *Commonwealth* v. *Roxbury, ante*, 495, 496, 501, 502.

On the 5th of July 1631 it was ordered, that " Conants Ileland, Noddles Ileland, Tompsons Ileland, togeather with all other ilelands within the lymitts of our pattent, shalbe appropriated to publique benefits and uses, and to remaine in the power of the governor and assistants (for the time being) to be lett and

disposed of by them to helpe towards publique charges." 1 Mass. Col. Rec. 89. On the 3d of April 1632 "Conant's Ileland or Governor's Garden " (now Governor's Island) " with all the liberties and previlidges of fishing and fowleing," was granted to Governor Winthrop, he covenanting "to plant a vineyard and an orchyard in the same," and paying a certain annual rent, which was afterwards fixed at " a hogshead of the best wyne that shall grow there," and later at " two bushells of apples every yeare, one bushell to the governor, and another to the generall courf in winter, the same to bee of the best apples there growing." 1 Mass. Col. Rec. 94, 139, 293, 301. In 1634–5 Long Island, Deer Island, Hogg Island and Spectacle Island were granted to the inhabitants of Boston, and Tompson's Island to the inhabitants of Dorchester, in fee, at certain annual rents. 1 Mass. Col. Rec. 115, 139. Noddle's Island, now East Boston, was granted in fee in 1633 at a yearly rent to Samuel Maverick, who had resided there before the arrival of Winthrop. 1 Mass. Col. Rec. 104. 1 Hutchinson's Hist. Mass. 26. It would seem that the order of 1640, declaring the flats to belong to that island, may have had reference to Maverick's title, rather than to the jurisdiction acquired under the intermediate order, by which " Nodles Island is layd to Boston." See orders of 1636–7 and 1640, *ante*, 465 note, 495.

The first indication of a division into counties is on the 3d of March 1635–6, when " it is ordered, that there shalbe four courts kept every quarter, 1, att Ipswich, to which Neweberry shall belonge ; 2, att Salem, to which Saugus shall belonge ; 3, at Newe Towne, to which Charlton, Concord, Meadford and Waterton shall belonge ; 4th, att Boston, to which Rocksbury, Dorchester, Weymothe and Hingham shall belonge." 1 Mass. Col. Rec. 169. The four counties, into which the whole territory of the Massachusetts Colony was divided in 1643, seem to have received their names from their relative positions — Essex being the eastern, Middlesex in the middle, Suffolk the southern, and (old) Norfolk the northern. 2 Mass. Col. Rec. 38 ; *ante*, 464 note. Hampshire County was created in 1662. 4 Mass. Col. Rec. pt. II. 52. In 1680, so much of Norfolk, as had not in the mean time been set off to New Hampshire, was incorporated into Essex. 5 Mass. Col. Rec. 264. The Colony of Plymouth was divided into the counties of Plymouth, Barnstable and Bristol, by an act of 1685, before its annexation to Massachusetts by the Province Charter. Plym. Col. Laws, (ed. 1685) 20 ; (ed. 1836) 294, 295. The islands of Nantucket and Martha's Vineyard and adjacent islands, when transferred by that charter from New York to Massachusetts, constituted Duke's County, from which Nantucket was set off as a separate county in 1695 by Prov. St. 7 W. & M. Prov. Laws, (ed. 1726) 38 ; (ed. 1759) 62. Worcester County was created in 1730, Prov. St. 4 G. 2, Anc. Chart. 484 ; Berkshire in 1761, Prov. St. 1 G. 3, Anc. Chart. 638 ; Norfolk (new) in 1793, *St.* 1792, *c.* 72 ; Hampden in 1811, *St.* 1811, *c.* 61 ; and Franklin in 1812, *St.* 1811, *c.* 137. The boundaries of counties are coextensive with the limits of the Commonwealth, for all purposes not affected by the Constitution and laws of the United States. *Commonwealth* v. *Peters*, 12 Met. 387. *Commonwealth* v. *Alger*, 7 Cush. 82. *Dunham* v. *Lamphere*, 3 Gray, 272. *Common-*

*wealth* v. *Roxbury, ante,* 494. Gen. Sts. *c.* 1, §§ 1, 2; *c.* 17, § 1. *Pollard* v. *Hagan,* 3 How. 230.

The Colony Charter vested in the government of the Colony both the right of property and the right of government in the sea shores and tide waters. 2 Dane Ab. 691. *Commonwealth* v. *Charlestown,* 1 Pick. 185. *Dill* v. *Wareham,* 7 Met. 445. *Weston* v. *Sampson,* 8 Cush. 353. *Commonwealth* v. *Alger,* 7 Cush. 65, 66, 81, 93. *Commonwealth* v. *Roxbury, ante,* 479, 481, 483, 492. But a grant of land from that government is not to be held to include the sea shore without clear words or necessary implication. *Commonwealth* v. *Roxbury, ante,* 493. The object of the only grant relied on by the defendants in this case seems to have been to define the inland boundaries and not those towards the shore. See *Bartlett, arguendo,* 471, 472, and records there cited; *Shaw,* C. J. *ante,* 487–490.

In 1639, Governor Winthrop says, "the people had long desired a body of laws, and thought their condition very unsafe while so much power rested in the discretion of magistrates." "Two great reasons there were, which caused most of the magistrates and some of the elders not to be very forward in this matter. One was, want of sufficient experience of the nature and disposition of the people, considered with the condition of the country and other circumstances, which made them conceive that such laws would be fittest for us, which should arise *pro re nata* upon occasions, etc., and so the laws of England and other states grew, and therefore the fundamental laws of England are called customs, *consuetudines.* 2. For that it would professedly transgress the limits of our charter, which provide, we shall make no laws repugnant to the laws of England, and that we were assured we must do. But to raise up laws by practice and custom had been no transgression." "At length (to satisfy the people) it proceeded." 1 Winthrop's Hist. N. E. 322, 323. 28 Mass. Hist. Coll. 204–209. By *Shaw,* C. J. in *Commonwealth* v. *Alger,* 7 Cush. 71. And the Body of Liberties, the first code of laws of the Massachusetts Colony, was finally adopted in December 1641. These laws were not printed, but were published in manuscript under the superintendence of a committee of which Governor Endicott, then deputy governor, was chairman; and, Governor Winthrop says, "established for three years, by that experience to have them fully amended and established to be perpetual." 1 Mass. Col. Rec. 344, 346. 2 Winthrop's Hist. N. E. 55. At the next session of the general court, on the 20th of May 1642, "the lawes were read over." 2 Mass. Col. Rec. 2. And before the expiration of the three years committees were appointed to revise the Body of Liberties, and orders relating to it were passed every year afterwards until 1648. 2 Mass. Col. Rec. 39, 61, 109 128, 157, 168, 196, 209, 217, 227, 230, 239, 246, 262, 263. 3 Mass. Col. Rec. 6 25, 46, 74, 85, 125, 130, 142.

The next edition was printed late in 1648, or early in 1649. 2 Mass. Col. Rec. 263, 286. 3 Mass. Col. Rec. 162. "A coppy of the printed lawes," was among the papers "left in honnored Mr. Winthrop's study" at his death, which took place March 26th 1649. 3 Mass. Col. Rec. 179. Hull's Diary, 3 Archæol. Amer. 173. But no copy of this edition is known to be in existence. 28 Mass.

Hist. Coll. 195. The reason of this may perhaps be found in a petition of Richard Russell, the Colony treasurer, on the 22d of May 1651, representing that " by the court's incoradgment " he had " purchased the last printed lawbookes, and by reason of the courts alteration of sume things in those bookes made them unvendible, insomuch that your petitioner lost above tenn pounds, a great part turned to waste papers, and many of them burnt; " upon which the general court " allowed him twenty pounds out of the next country rate." 58 Mass. Archives, fol. 18. 3 Mass. Col. Rec. 232. 4 Mass. Col. Rec. pt. I. 50. And in an order of May 14th 1659 the general court say, " The bookes of lawes, of the first impression, not being to be had for the supply of the country, putt us upo thoughts of a second." 47 Mass. Archives, 35.

The Body of Liberties did not determine or define the title in the sea shore between high and low water mark. But on the 4th of June 1644 the deputies appointed a committee " for to consider of the bill presented to the howse concerning mens proprieties, and to returne theire thaughts of the particulers therein exprest." 3 Mass. Col. Rec. 4. It may be conjectured that this bill was the original draft of the ordinance declaring the title of proprietors of land on the sea shore to extend to low water mark or one hundred rods, which is now well understood to have been passed not in 1641, but in 1647. 28 Mass. Hist. Coll. 215. Shaw, C. J., in Commonwealth v. Alger, 7 Cush. 67, 68. Resolve of 1649, ante, 465 note.

In the earliest times of the Colony, before the passage of any ordinance on the subject, wharves were built by the proprietors of land bounding on the sea, 'by the permission or authority of the towns, and with the approval of the general court. The earliest order of this kind, appearing in the Boston town records, is one of January 21st 1638-9, by which " there is granted to the owners of the wharfe and crayne an hundred acres of land at Mount Woolystone, next to the allotments already graunted, towarde the repayring and mainteyening of the said wharfe and crayne." 1 Boston Town Rec. 27. On the 25th of May 1640, " Mr. Edward Ting is granted to digg turfe of the island lieing among the flats by the mill feild going to Charlestowne." 1 Boston Town Rec. 45. On the 6th of October 1641, " Francis Willoughby, Edward Tinge and Edward Bendall " presented a petition to the general court, representing that they " have beene att greate costs and charges, to the expense of a greate part of our estates in erecting warehouses and framing of wharfes with many other necessaryes, for expeditinge and safe landinge of such comodetyes and goods as come (not onelye from aboute home, but alsoe) from further partes, expedient and usefull according to our hopes and intentions for the publique good," and praying the court " to appoynte unto us a certaine rate for wharfage, porterage and howsing of goods; that having your worships authoretye for our demands and dues in this case by this honored corte provided, we may not (justlye) offende anye, by our owne demande." On this petition the general court appointed a committee " to settle rates of wharfage, porterage and warehouse huire, and certify at the next generall court, and the order to stand the meanewhile." 60 Mass. Archives, fol. 1

1 Mass. Col. Rec. 341. And see 2 Mass. Col. Rec. 170, 205; 3 Mass. Col. Rec. 82, 83. On the 29th of November 1641, the town granted to Valentine Hill " and to his associates " " all the wast ground (common highway and proprieties reserved) from the point of the marish betweene Mr. William Tynge's pales and John Lowe's howse there as it is now staked out, to the uppermost corner of Mr. Edward Tynge's proprietie neare the key already staked out, and so round by Edward Bendall's to the point forementioned, for so many yeares, as the charge they shall bestowe in purchase of their neighbours theire late wharfinge, and in building, making and repairing such wharfes, creekes, or coves, within this five yeares now next comming shall amount unto," &c.; with license " to take tunnage of all such vessells, and wharfage of all such goods, as shall there arrive or make use thereof during the sayd termes;" provided " that all such whose grounds doe butt on the wast grounds above granted or highwayes there, shall be free to import, land, and export, within this jurisdiction (except by way of merchandise) all their owne goods, wood, timber and other things being originally of this jurisdiction, without any charge;" and " such warehouses or other houses as they shall erect during their terme they shall be allowed for by the towne after such rate as they shall be valued to be there worth without respect of the place;" and " such wharfes, as they shall make there, they shall leave in good repaire, and so as they may be of use to the towne at the end of the time;" and also " sufficiently wharfe, and from time to time keepe in repaire the creeke next unto George Burden's house fitting for the lading and unlading of lighter of twenty tunne in ordinary tydes on eyther syde thereof;" and " provided also that if Mr. Edward Tynge shall within five yeares now next cominge wharf in that part of the waste betweene the inside of the crosse wall and Mr. Hill's wharfe end " he shall enjoy " the sole libertye of tunnage and wharfage by and upon the same, without contributing to any other charge." 1 Boston Town Rec. 56, 57. In the allotments of lands recorded in 1635 estates of Valentine Hill and others were bounded " by the common shore." 1 Boston Town Rec. 22. In 1643 and 1644 there were grants by the town of Boston to many a person of " liberty to wharf before his propriety." Boston Town Rec. *Wheeler* v. *Stone,* 1 Cush. 318.

The orders above quoted seem at least to prove a usage similar to that which was established in Rhode Island by a colonial statute in 1707, and has continued there to the present day; and which has also prevailed, without any express statute, in Connecticut and New Jersey; by which the proprietor of the upland, though he has no title below high water mark, may build wharves, and thus exclusively occupy the space between high and low water mark. Angell on Tide Waters, (2d ed.) 236, 237. 1 Swift's System, 341. *Chapman* v. *Kimball,* 9 Conn. 38. *Simons* v. *French,* 25 Conn. 346. *Gough* v. *Bell,* 1 Zab. 156; 2 Zab. 441; 3 Zab. 624. *State* v. *Jersey City,* 1 Dutcher, 525. *State* v. *Brown,* 3 Dutcher, 13. The main object of the Massachusetts Colony ordinance has always been understood to be to induce the erection of wharves for the benefit of commerce. *Storer* v. *Freeman,* 6 Mass. 438. *Commonwealth* v. *Charlestown,* 1 Pick. 183. *Walker* v. *Boston & Maine Railroad,* 3 Cush. 24. And see *Dutton* v. *Strong,* 1 Black, 32.

But there is some evidence which goes further, and tends to show that th towns, without any other legislative authority than might be derived from the ac' of March 3d 1635–6, (*ante*, 460 note, 511,) exercised the power of making absolute grants below high water mark. The right of towns to appropriate " fishing and fowling," at least, if not " bays, coves and rivers," was recognized in the ordinance of 1641, *ante*, 465 note. And their right to appropriate fish, if nct appropriated by the legislature, has been affirmed by judicial decision, and called by Chief Justice Parsons a " rule of our common law." But towns hav no right of property in fisheries within their limits; and their power ceases upon a regulation of the whole subject by the legislature. *Coolidge* v. *Williams*, 4 Mass. 144. *Randolph* v. *Braintree*, 4 Mass. 317. 2 Dane Ab. 700, 701, 706. *Dill* v. *Wareham*, 7 Met. 446. On the 31st of July 1643, the town of Boston granted to Henry Simons and others " and their parteners all that cove (already bounded) on the norwest side of the causey leading toward Charlestown, with all the salt marsh bordering thereupon round about not formerly granted to any other (reserving liberty from time to time to make use of any part thereof for repayring the said causey) to have and enjoy the said cove and marish to them, and their heirs and assignes forever." 1 Boston Town Rec. 66. In 1828 the supreme judicial court, assuming that this grant was made after the passage of the ordinance annexing the flats to the upland, held that, in the absence of any proof of the bounds referred to, it passed the whole cove. *Rust* v. *Boston Mill Corporation*, 6 Pick. 166–170. On the 23d of March 1646, propositions were " presented to the townsmen on the behalfe of the inhabitants of the northend of the towne of Boston " for building a " fortification at Walter Merry's Point " upon certain terms, one of which was " that the ground nor flats before the sayd worke may not be disposed of by the towne unto any particular man's imploy to the prejudice of the said worke." And on the 30th of the same month " George Halsott is graunted liberty to set downe a cawsey ten foot square from his wharfe, at the northend of it, to low watter marke, and that passingers shall come and goe free to it." 1 Boston Town Rec. 79. A resolve of the general court in 1649 declared lands below high water mark, set apart by the inhabitants of a town for the purpose of thatching houses, not to be affected by the subsequent ordinance annexing the flats to the upland. *Ante*, 465 note.

In speaking of the common law of England, limiting the right of proprietors of land bounding upon tide waters to high water mark, it was assumed, without discussion, by *Shaw*, C. J., that, in this respect, (as was doubtless the case in most others,) " the first settlers of Massachusetts regarded the law of England as their law, and governed themselves by it." *Commonwealth* v. *Alger*, 7 Cush. 66, 94. But with all deference to so great an authority, it may be doubted, in view of the precedents just cited, whether the early settlers of Massachusetts thought of the peculiar title of the government in lands flowed by the tide, until they were led, in the framing of a code of laws, to determine the relative rights of the public and of individuals; or whether they then did anything more than to define and make certain a somewhat indefinite usage which had already grown

up. So thought James Sullivan, who had been one of the first judges of the supreme judicial court after the Revolution. "From the first settlement of the Colony of Massachusetts," he says, "that government practised upon the principles of this provision." Sullivan on Land Titles, 285.

Chief Justice Parsons said that the rule established by the ordinance had by usage acquired "force as our common law;" and that the ordinance itself "was annulled with the Charter by the authority of which it was made." Storer v. Freeman, 6 Mass. 438. But the validity of the judgment against the charter in 1684 (founded on charges of having illegally levied taxes and duties, coined money, and imposed an oath of fidelity) was denied by the house of commons, and "questioned by very great authority in England," and was never admitted here. 32 Mass. Hist. Coll. 246–278. 1 Hutchinson's Hist. Mass. 347, 366. 1 Chalmers Annals, 415. 5 Mass. Col. Rec. 422–425, 439–441, 456–459, 466. By Shaw, C. J., in Commonwealth v. Alger, 7 Cush. 76. The act of 1685, referred to ante, 466, and another act amending it, were passed after notice of the repeal of the Charter. 5 Mass. Col. Rec. 470, 473. And almost the last act of the last general court held under the Colony Charter was to appoint "a committee for a repository of such papers on file with the secretary as refer to our charter, and negotiations, from time to time, for the security thereof, with such as referr to our title of our land, by purchase of Indeans or otherwise." 5 Mass. Col. Rec. 516.

Andros indeed pretended that all grants of lands were avoided by the repeal of the Charter. 1 Hutchinson's Hist. Mass. 321, 322, 330. 2 Bancroft's Hist. U. S. 428. But after he was deposed, on the 22d of June 1689, " at the convention of the governour and council and representatives of the Massachusets Colony, it is declared that all the laws made by the Governour and Company of said colony, that were in force on the twelfth day of May one thousand six hundred eighty six (except any that are repugnant to the laws of England) are the laws of this colony, and continue in force till farther settlement, to which all inhabitants and residents here are to give due obedience." 3 Hutchinson Papers, 372, in Mass. Hist. Soc. Lib. This 12th of May was the first day of the political year, and before the arrival of the first royal commission after the repeal of the charter 5 Mass. Col. Rec. 513, 516. 1 Hutchinson's Hist. Mass. 306.

The opinion expressed by Chief Justice Parsons upon the effect of the repeal of the Charter was probably derived from Judge Trowbridge, with whom he had studied. 7 Mass. 20. Knapp's Biog. Sketches, 43. Judge Trowbridge, as appears by his own manuscripts, (which have passed from his nephew, Chief Justice Dana, into the possession of the latter's grandson, Mr. Edmund Trow bridge Dana,) gave an opinion that rape was not entitled to the benefit of clergy by the laws of the Province, because the Prov. St. of 9 W. 3 did not make it a new felony, but only reaffirmed the law as it stood before, by the colony laws of 1649 and 1669, or the English Sts. of 13 & 25 Edw. 3 and 18 Eliz.; and added, " The old charter was vacated in 1686, and thereupon the laws of England revived here. If rape under the old charter should not be thought felony, not being absolutely punishable with death, yet as there was eleven years between

the old charter and the making this act, must not the laws of England in that time revive, so as that rape within that time must be felony without clergy." See also Quincy, 53, note; 2 Hutchinson's Hist. Mass. 20.

The contrary opinion cannot be maintained, as Chief Justice Shaw was wont to do, by reference to the provincial statutes of May and November 1692 (4 W. & M.), continuing in force the colonial laws. Anc. Chart. 213, 229. 3 Amer. Jurist, 119, 120. *Barker* v. *Bates*, 13 Pick. 258. *Commonwealth* v. *Alger*, 7 Cush. 76, 77. For those acts were disallowed in England, under the power reserved in the Province Charter. Anc. Chart. 34. 2 Hutchinson's Hist. Mass. 18. A letter of December 26th 1695, signed by Lord Keeper Somers and other lords of the council, during the absence of King William in Holland, informed the governor and council of Massachusetts Bay that "it hath been thought fit to repeal both the said acts, it being judged necessary that in any new law to be enacted for the said purpose the laws to be continued be therein expressed and particularly specified." New England Board of Trade Entry Book, No. 35, fol. 200, in State Paper Office in London. This letter was received by the governor and council on the 13th of July 1696. Copies of Council Rec. 1696, fol. 403, in Office of Secretary of the Commonwealth. And the acts so repealed were omitted in all subsequent editions of the province laws, beginning with that of 1699.

But there was nothing in the repeal of the Colony Charter, or in the Province Charter, or in any intermediate proceedings, to reduce Massachusetts to the condition of a newly conquered country, in which alone has it ever been even pretended that private rights are affected by a change in the form of government. *Campbell* v. *Hall*, Cowp. 208 *& seq. United States* v. *Percheman*, 7 Pet. 86, 87. *Commonwealth* v. *Alger*, 7 Cush. 76. 3 Amer. Jurist, 118, 119. And see 1 Hutchinson's Hist. Mass. 316, 317. The Province Charter expressly confirmed all grants of lands made by the general court of the Colony. Anc. Chart. 26, 27; *ante*, 466. George Chalmers, who had access to the public documents in England, wrote that on the arrival of Governor Phipps with the Province Charter "the change which was made was scarcely perceptible, almost the same men were continued in power, the laws and customs of former times were continued." 2 Chalmers Annals, MS. And by the Constitution of Massachusetts, *c.* 6, art. 6, "all the laws which have been adopted and approved in the Province, Colony or State of Massachusetts Bay, and usually practised on in the courts of law" are expressly continued in force. And see 3 Amer. Jurist, 119.

The colony ordinance of 1647 was not a mere revocable license, but a grant of title, sufficient to support a writ of entry, or an action of trespass *quare clausum fregit.* 2 Dane Ab. 694. *Austin* v. *Carter*, 1 Mass. 231. *Commonwealth* v. *Alger*, 7 Cush. 70, 71, 79, 80, 81. *Porter* v. *Sullivan*, 7 Gray, 443, 445, 449. *Boston* v. *Lecraw*, 17 How. 432, 433. The Commonwealth retains no title or easement in the flats so granted, unless it owns the upland; but its grant of a mere easement over flats does not release its title in them. *Walker* v. *Boston & Maine Railroad*, 3 Cush. 21. *Commonwealth* v. *Boston & Maine Railroad*, 3 Cush. 43. *Commonwealth* v. *Roxbury*, *ante*, 499.

The owner of flats may, unless prohibited by the legislature, reclaim them, by building wharves or otherwise, so as to exclude navigation, provided he does not. wholly cut off his neighbors' access to their houses or lands. *Commonwealth* v. *Pierce*, (1790,) 2 Dane Ab. 696. *Austin* v. *Carter*, 1 Mass. 231.' *Storer* v. *Freeman*, 6 Mass. 438. 2 Dane Ab. 700. *Davidson* v. *Boston & Maine Railroad*, 3 Cush. 106. *Commonwealth* v. *Alger*, 7 Cush. 75, 79, 81. *Deering* v. *Long Wharf*, 25 Maine, 65. *Low* v. ·*Knowlton*, 26 Maine, 132. Or he may plant stakes thereon, even to the obstruction of the public right of fishing. *Locke* v. *Motley*, 2 Gray, 266. Towns and cities have like rights in flats owned by them. *Coolidge* v. *Williams*, 4 Mass. 144. 2 Dane Ab. 706. *Richardson* v. *Boston*, 19 How. 269; 24 How. 193. But the omission of the owner of flats to inclose them, and their use for navigation, or for landing wood and other articles, do not prove a dedication to the public. *Boston* v. *Lecraw*, 17 How. 435. *State* v. *Wilson*, 42 Maine, 28. *Green* v. *Chelsea*, 24 Pick. 80. Evidence of possession of a sea-shore by individual inhabitants of a town, is no evidence of a right in the town. *Sale* v. *Pratt*, 19 Pick. 197. *Green* v. *Chelsea*, 24 Pick. 79.

All persons have the right to use uninclosed flats for the purposes of navigation. *Drake* v. *Curtis*, 1 Cush. 413. *Commonwealth* v. *Alger*, 7 Cush. 74, 75, 79, 88, 89. *Boston* v. *Lecraw*, 17 How. 433, 434. *Deering* v. *Long Wharf*, 25 Maine, 65. *Gerrish* v. *Union Wharf*, 26 Maine, 392. Tide waters, capable of sustaining vessels˚ of any description with their loading, for purposes really useful to trade or navigation, at any state of the tide, cannot be obstructed with dams, highways or bridges, without authority of the legislature. *Dunbar* v. *Vinal* (1801) Sullivan on Land Titles, 286, 287; 2 Dane Ab. 695, 696. *Commonwealth* v. *Coombs*, 2 Mass. 492. *Arundel* v. *McCulloch*, 10 Mass. 71. *Commonwealth* v. *Charlestown*, 1 Pick. 184–188. *Keen* v. *Stetson*, 5 Pick. 494, 495. *Rowe* v. *Granite Bridge*, 21 Pick. 347. *Charlestown* v. *County Commissioners*, 3 Met. 202. *Marblehead* v. *County Commissioners*, 5 Gray, 252. *Commonwealth* v. *Roxbury*, ante, 495. *Richardson* v. *Boston*, 19 How. 269. But the legislature of the Commonwealth may authorize a bridge across tide waters. *Commonwealth* v. *Breed*, 4 Pick. 463. *Commonwealth* v. *New Bedford Bridge*, 2 Gray, 239. It is tide water wherever the ebb and flow of the tide is felt, whether the water is salt or fresh. *The King* v. *Smith*, 2 Doug. 444. *Peyroux* v. *Howard*, 7 Pet. 343. *Lapish* v. *Bangor Bank*, 8 Greenl. 85. After flats have been filled up by the owner, the consent of the legislature is not necessary to the location of a highway over the land. *Henshaw* v. *Hunting*, 1 Gray, 219. A town or city cannot lay out a highway for boats or vessels on tide water, even over flats owned by itself in fee. *Richardson* v. *Boston*, 24 How. 194, 195. As to the power of a town or city to fill up a creek to remove a nuisance, see *Baker* v. *Boston*, 12 Pick. 183.

The legislature may without compensation prohibit taking gravel from a beach, or building upon flats, whenever in their opinion such prohibition would benefit navigation. *Commonwealth* v. *Tewksbury*, 11 Met. 55. *Commonwealth* v. *Alger*, 7 Cush. 82–104. *Boston* v. *Lecraw*, 17 How. 433. They may authorize

a mill corporation to exclude water from flats to maintain a tide mill, making reasonable compensation; *Boston & Roxbury Mill Corporation* v. *Newman*, 12 Pick. 467; and, on compensating such corporation, may take the basin so formed by the tide mill for other public improvements. *Boston Water Power Co.* v. *Boston & Worcester Railroad*, 23 Pick. 360. Such exclusion of the tide water does not affect the title to lands in the basin. *Commonwealth* v. *Roxbury*, ante, 456, 499. The mill acts do not apply to tide mills. *Murdock* v. *Stickney*, 8 Cush. 113. And see *Cogswell* v. *Essex Mill Corporation*, 6 Pick. 94.

On the laying out of a railroad over flats, the damages thereby occasioned to an adjacent wharf may be recovered by its owner. *Ashby* v. *Eastern Railroad*, 5 Met. 371, 372. So may the expense of raising other flats, rendered necessary by the building of the railroad to enable the owner to enjoy them. *Commonwealth* v. *Boston & Maine Railroad*, 3 Cush. 53. But the expenses of structures necessary to protect land from the effect of a change in the currents of tide water by the erection of a drawbridge are too remote. *Fitchburg Railroad* v. *Boston & Maine Railroad*, 3 Cush. 88. The fact that a railroad is laid out over tide water does not preclude a claim for compensation for the construction of another railroad across its track. *Grand Junction Railroad* v. *County Commissioners*, 14 Gray, 565. A city, constructing a drain discharging into tide water in such a manner as to cause accumulations at the end of a wharf and impede the access of vessels thereto, is liable for the damages so occasioned. *Richardson* v. *Boston*, 19 How. 270.

The owner of flats has no right, either against the Commonwealth or against coterminous proprietors, to have his flats kept open for the ebb and flow of the tide, either for tide mills or for navigation; but only to the flow of the water below low water mark, and to some access thereto. *Davidson* v. *Boston & Maine Railroad*, 3 Cush. 105, 106. *Brightman* v. *Fairhaven*, 7 Gray, 271. *Boston* v. *Lecraw*, 17 How. 436. *Richardson* v. *Boston*, 19 How. 269. The Commonwealth still owns the flats below the limit of the ordinance; and the erection of a wharf upon them without authority is a nuisance, at least if it obstructs navigation. *Commonwealth* v. *Pierce*, (1790) 2 Dane Ab. 696. *Commonwealth* v. *Crowninshield*, (1796) Sullivan on Land Titles, 286; 2 Dane Ab. 697. *Commonwealth* v. *May*, (1803) 3 Amer. Jurist, 190 note. *Boston & Roxbury Mill Corporation* v. *Newman*, 12 Pick. 466. *Commonwealth* v. *Alger*, 7 Cush. 92. *Commonwealth* v. *Roxbury*, ante, 497. *Commonwealth* v. *Wright*, 3 Amer. Jurist, 185; Thach. C. C. 211. But such flats may be granted by the legislature, and a statute authorizing the extension of a wharf over them is an irrevocable grant. *Fitchburg Railroad* v. *Boston & Maine Railroad*, 3 Cush. 87.

What is high water mark has never been adjudged in this commonwealth. But it would seem to be the ordinary high tide. *Storer* v. *Freeman*, 6 Mass. 439. *Commonwealth* v. *Charlestown*, 1 Pick. 182. *Porter* v. *Sullivan*, 7 Gray, 443. *Commonwealth* v. *Roxbury*, ante, 477, 483, 491. St. 1814, c. 39, § 2. Hale *de Jure Maris*, in Hargrave's Tracts, 12, 25, 26. *Blundell* v. *Catterall*, 5 B. & Ald 290. *Lowe* v. *Govett*, 3 B. & Ad. 863. *Attorney General* v. *Chambers*, 4 DeGex,

Macn. & Gord. 218. *Cortelyou* v. *Van Brandt*, 2 Johns. 362. *Galveston* v. *Menard*, 23 Tex. 399. Yet the low water mark intended by the ordinance is not the ordinary ebb, but where the tide ebbs the lowest, because there it may be most important to extend a wharf. *Sparhawk* v. *Bullard*, 1 Met. 97, 107. *Walker* v. *Boston & Maine Railroad*, 3 Cush. 22. *Gerrish* v. *Union Wharf*, 26 Maine, 395, 396, *contra.* A boundary " by low water mark " is sufficiently certain in a verdict upon a writ of right. *Adams* v. *Frothingham*, 3 Mass. 357, 364. Upon a gradual change in the channel of a river, the increase, whether arising from natural causes, or from a combination of natural and artificial causes, belongs to the owner of the land or flats to which it is attached. *Commonwealth* v. *Pierce*, 2 Dane Ab. 696. *Adams* v. *Frothingham*, 3 Mass. 363. *Dunlap* v. *Stetson*, 4 Mason, 366, 367. If thatch islands, covered with water at ordinary flood tides, carry with them any title in the flats adjoining, it is only towards low water mark. *Thornton* v. *Foss*, 26 Maine, 404, 405. Islands formed below low water mark belong to the Commonwealth. *Hopkins Academy* v. *Dickinson*, 9 Cush. 550. *Middletown* v. *Sage*, 8 Conn. 228.

The ordinance applies to the shores of the open sea, as well as to creeks, coves or rivers. *Barber* v. *Bates*, 13 Pick. 255. *Sale* v. *Pratt*, 19 Pick. 197. *Commonwealth* v. *Alger*, 7 Cush. 76. The words "riparian proprietor" have been heedlessly extended from rivers and streams to the shores of the sea. If it is necessary to express it by a single adjective, the term "littoral proprietor," as used by the plaintiff's counsel in *Commonwealth* v. *Roxbury*, *ante*, 472, and by the supreme court of the United States in *Boston* v. *Lecraw*, 17 How. 432, 433, is more accurate.

The difficulty of applying the rule of the ordinance to the conflicting claims of coterminous proprietors was perceived very early. In 1683 the following question was presented (by whom does not appear) to the general court : " In regard the law entituled Libertys common doth give to all that border upon highwater mark the flats lying before their land downe to low water mark. Hence Query. When severall proprietors have land bordering upon a cove which is more than a semicircle. Q. Whether a line from the circumference to the center of the semicircle ought not be the bounds to each mans propriety, and not low water mark." By a plan annexed the question would appear to have arisen in Braintree. The magistrates thereupon on the 17th of May 1683 passed the following act, which however was not consented to by the deputies : " For further explanation of the law granting to all proprietors of lands butting upon the salt water interest in the flatts to low water mark. Resolved upon the question, That where lands are so circumstanced as that to continue their bounds on strait lines to the lower water mark would unavoidably interfere one with another, the flats adjacent to low water mark shall be divided in proportion to each proprietors breadth upon high water mark : Provided alwayes this act of the court shall not be construed to disturb any orderly settlement formerly made." 47 Mass. Archives, 54.

The general rules for the division of flats among coterminous proprietors, so far as they can be ascertained from the adjudged cases, may be thus stated :

1st. The intention of the ordinance was, " if practicable, to give to every proprietor the flats in front of his upland, of equal width with his lot at low water mark." *Wilde*, J., in *Gray* v. *Deluce*, 5 Cush. 12. And see *Deerfield* v. *Arms*, 17 Pick. 45. Whether the proprietor of upland, even if bounding on a cove, can claim flats in any other direction than towards low water mark has not been adjudged. The late Chief Justice Shaw and Mr. Samuel Hoar, sitting as referees, awarded that he could ; Chief Justice Parker and Mr. Justice Wilde were of opinion that he could not. *Jones* v. *Boston Mill Corporation*, 6 Pick. 151, 156 *Rust* v. *Boston Mill Corporation*, 6 Pick. 161, 167. And see *Thornton* v. *Foss*, 26 Maine, 405.

2d. The nearest channel from which the tide never ebbs, though not adapted to navigation, is the limit. *Sparhawk* v. *Bullard*, 1 Met. 107. *Ashby* v. *Eastern Railroad*, 5 Met. 370. *Walker* v. *Boston & Maine Railroad*, 3 Cush. 22, 24 *Attorney General* v. *Boston Wharf*, 12 Gray,

3d. The direction of the side lines of the flats is not governed by that of the side lines of the upland. *Rust* v. *Boston Mill Corporation*, 6 Pick. 169. *Piper* v. *Richardson*, 9 Met. 158. *Curtis* v. *Francis*, 9 Cush. 438, 442. *Emerson* v. *Taylor*, 9 Greenl. 43. Unless expressly so agreed by the parties. *Dawes* v. *Prentice*, 16 Pick. 442.

4th. Where there is no cove or headland, a straight line is to be drawn according to the general course of the shore at high water, and the side lines of the lots extended at right angles with the shore line. *Sparhawk* v. *Bullard*, 1 Met. 106. *Porter* v. *Sullivan*, 7 Gray, 443. *Deerfield* v. *Arms*, 17 Pick. 45, 46. *Knight* v. *Wilder*, 2 Cush. 210.

5th. Around a headland, the lines dividing the flats must diverge towards low water mark. *Wilde*, J., in *Gray* v. *Deluce*, 5 Cush. 12, 13. *Shaw*, C. J., in *Porter* v. *Sullivan*, 7 Gray, 443. *Emerson* v. *Taylor*, 9 Greenl. 46.

6th. In a shallow cove, in which there is no channel, a base line may be run across the mouth of the cove, and parallel lines drawn, at right angles with the base line, from the ends of the division lines of the upland to low water mark. *Gray* v. *Deluce*, 5 Cush. 12, 13. See *Attorney General* v. *Boston Wharf*, 12 Gray,

7th. A deep cove, out of which the tide entirely ebbs at low water, is to be divided by drawing a line across its mouth, giving to each proprietor a width upon the base line proportional to the width of his shore line, and then drawing straight converging lines from the divisions at the shore to the corresponding points on the base line. This rule (which is substantially that suggested by the magistrates in 1683, *ante*, 521,) was first revived by *Wilde*, J., in the hypothetical case of a cove the circumference of which was twice its diameter, or deeper than a semicircle. *Rust* v. *Boston Mill Corporation*, 6 Pick. 167, 168. It has since been acted upon in other cases, the reports of which contain no plan or description of the proportions of the coves in question. *Sparhawk* v. *Bullard*, 1 Met. 107. *Wheeler* v. *Stone*, 1 Cush. 323. And see *Ashby* v. *Eastern Railroad*, 5 Met. 369, 370 ; *Deerfield* v. *Arms*, 17 Pick. 45, 46.

8th. The direction of the side lines of flats in a cove may be modified by the course of the channel bounding them, or by the position of other channels between part of that channel and the upland. *Walker* v. *Boston & Maine Railroad,* 3 Cush. 22, 23, 24. *Commonwealth* v. *Alger,* 7 Cush. 69. *Porter* v. *Sullivan,* 7 Gray, 448, 449. *Attorney General* v. *Boston Wharf,* 12 Gray,

9th. It seems, that after passing the mouth or narrowest part of a cove, the lines may diverge, if necessary to preserve the proportions of different estates. *Walker* v. *Boston & Maine Railroad,* 3 Cush 25.

10th. An agreement of coterminous proprietors as to the direction of their boundaries may be proved, or presumed from their acts and those of public authorities. *Sparhawk* v. *Bullard,* 1 Met. 95. *Curtis* v. *Francis,* 9 Cush. 442, 460, 463, 466. *Adams* v. *Boston Wharf,* 10 Gray, . *Attorney General* v. *Boston Wharf,* 12 Gray, . *Rider* v. *Thompson,* 23 Maine, 243. *Treat* v. *Chipman,* 35 Maine, 34. Thus the lines of the flats at the foot of Summer Street in Boston have been repeatedly found by juries, under the instructions and with the approval of the court, to be parallel with the line of that street as established by the selectmen about 1663. *Valentine* v. *Piper,* 22 Pick. 95, 96. *Piper* v. *Richardson,* 9 Met. 163. *Drake* v. *Curtis,* 9 Cush. 447 note. In the large cove to the northward of that street, the flats were distributed according to an agreement made in 1673 for the erection of a barricade against the Dutch; but the legal effect of that agreement has never been judicially ascertained. *Brimmer* v. *Long Wharf,* 5 Pick. 135, 138. *Wheeler* v. *Stone,* 1 Cush. 319, 320. *Commonwealth* v. *Alger,* 7 Cush. 73. Colony Law of 1681, 5 Mass. Col. Rec. 310, 311. Bowditch on Flats, 4.

The ordinance of 1647 has been extended by usage to Plymouth, to Nantucket and Dukes County, and to Maine, although none of these were under the jurisdiction of Massachusetts when it was made. Sullivan on Land Titles, 285. *Barker* v. *Bates,* 13 Pick. 258, 260. *Mayhew* v. *Norton,* 17 Pick. 357. *Storer* v. *Freeman,* 6 Mass. 435. 2 Dane Ab. 701. *Codman* v. *Winslow,* 10 Mass. 146. *Lapish* v. *Bangor Bank,* 8 Greenl. 89, 93. *Weston* v. *Sampson,* 8 Cush. 354. *Commonwealth* v. *Alger,* 7 Cush. 76. *Moulton* v. *Libbey,* 37 Maine, 485.

The rule which has been adopted in Maine for the division of flats among coterminous proprietors, in the absence of any agreement between them, or any adverse possession, is to draw a base line between the two corners of each lot at the shore, and then run a line from each corner, at right angles with the base line, to low water mark; and, if the side lines diverge from or conflict with each other, to divide equally between the two proprietors the land excluded or included by both lines; and not to allow any subdivision of lots to change the side lines as required by an earlier division of the upland. How this rule should be applied in a cove so deep as to bring more than two of such side lines into conflict with each other has never been decided. *Emerson* v. *Taylor,* 9 Greenl. 42. *Kennebec Ferry* v. *Bradstreet,* 28 Maine, 374. *Treat* v. *Chipman,* 35 Maine, 36. *Call* v. *Lowell,* 40 Maine, 31.

Seisin of flats follows the legal title, unless an exclusive possession is proved

*Codman* v. *Winslow,* 10 Mass. 151.   *Brimmer* v. *Long Wharf,* 5 Pick. 135.   *Rust* v. *Boston Mill Corporation,* 6 Pick. 171.   *Wheeler* v. *Stone,* 1 Cush. 317.   Disseisin of flats may be effected by filling them up, or by building a wharf on them and laying vessels at the end of it.   *Rust* v. *Boston Mill Corporation,* 6 Pick. 158.   *Wheeler* v. *Stone,* 1 Cush. 315, 322.   And see *Treat* v. *Chipman,* 35 Maine, 34.   But such use of flats adjoining a wharf does not necessarily exclude their use by others.   *Gray* v. *Bartlett,* 20 Pick. 192.   *Deering* v. *Long Wharf,* 25 Maine, 65.   Sailing over uninclosed flats, when covered by the tide, will not constitute disseisin.   *Brimmer* v. *Long Wharf,* 5 Pick. 139.   *Drake* v. *Curtis,* 1 Cush. 415–419.   *Curtis* v. *Francis,* 9 Cush. 466.   Nor will occasionally cutting grass on them.   *Commonwealth* v. *Roxbury, ante,* 499.   *Thornton* v. *Foss,* 26 Maine, 404.   Yet see *Clancey* v. *Houdlette,* 39 Maine, 457.

Since the passage of the ordinance, a grant of land bounding on the sea shore carries the flats, in the absence of excluding words.   2 Dane Ab. 691, 699.   *Valentine* v. *Piper,* 22 Pick. 94.   *Drake* v. *Curtis,* 1 Cush. 413.   But the owner may sell either flats or upland separately.   2 Dane Ab. 699, 701.   *Storer* v. *Freeman,* 6 Mass. 439.   *Mayhew* v. *Norton,* 17 Pick. 357.   *Commonwealth* v. *Alger,* 7 Cush. 80.   *Porter* v. *Sullivan,* 7 Gray, 445, 447.   *Lapish* v. *Bangor Bank,* 8 Greenl. 91.   *Deering* v. *Long Wharf,* 25 Maine, 64.   Flats may pass as appurtenances of a wharf, or a messuage.   2 Dane Ab. 690, 700, 701.   *Doane* v. *Broad Street Association,* 6 Mass. 333, 334.   *Ashby* v. *Eastern Railroad,* 5 Met. 369.   *Jackson* v. *Boston & Worcester Railroad,* 1 Cush. 580.   *Commonwealth* v. *Alger,* 7 Cush. 80.   Doubtful words are to be taken most strongly against a private grantor.   *Adams* v. *Frothingham,* 3 Mass. 361.   *Saltonstall* v. *Long Wharf,* 7 Cush. 201.   *Winslow* v. *Patten,* 34 Maine, 25.   Otherwise, in public grants.   *Commonwealth* v. *Roxbury, ante,* 490.

The general principle is, that a boundary by the tide water passes the flats, but a boundary by the land under the water excludes them.   Thus flats are included in a grant bounded "by the harbor," *Mayhew* v. *Norton,* 17 Pick. 359; "by the sea or salt water," *Green* v. *Chelsea,* 24 Pick. 77; "by the sea," *Jackson* v. *Boston & Worcester Railroad,* 1 Cush. 478; *Saltonstall* v. *Long Wharf,* 7 Cush. 200; "by the creek," *Harlow* v. *Fisk,* 12 Cush. 302; "on the stream," *Lapish* v. *Bangor Bank,* 8 Greenl. 92, 93; or "river," *Moore* v. *Griffin,* 22 Maine, 350; or "bay," *Partridge* v. *Luce,* 36 Maine, 19.   On the other hand, "by the shore," *Storer* v. *Freeman,* 6 Mass. 439; or "beach," *Niles* v. *Patch,* 13 Gray, 257; or "flats," *Parsons,* C. J., in *Storer* v. *Freeman,* 6 Mass. 439; *Fletcher,* J., in *Saltonstall* v. *Long Wharf,* 7 Cush. 200; excludes the flats.   See also *Dunlap* v. *Stetson,* 4 Mason, 366; *Lapish* v. *Bangor Bank,* 8 Greenl. 90.   But the effect of such general words may be controlled by specific monuments or abuttals.   *Storer* v. *Freeman,* 6 Mass. 440, 441.   *Chapman* v. *Edmands,* 3 Allen, 514.   Yet a specific abuttal must yield, if contrary to the intention apparent upon the whole deed.   *Jackson* v. *Boston & Worcester Railroad,* 1 Cush. 579.   A boundary "by a way," *Codman·* v. *Winslow,* 10 Mass. 149; "by the marsh," *Rust* v. *Boston Mill Corporation,* 6 Pick. 166; or "by a cliff," *Baker*

v. *Bates*, 13 Pick. 256, 261, excludes the flats beyond. A private grant, " on the sea or flats," or " by the sea or beach," being ambiguous, passes the flats. *Saltonstall* v. *Long Wharf*, 7 Cush. 195. *Doane* v. *Willcutt*, 5 Gray, 335 " Harbor " or " flats " is a monument, which governs courses and distances. *Mayhew* v. *Norton*, 17 Pick. 359. *Curtis* v. *Francis*, 9 Cush. 435–440, 465. And see *Brimmer* v. *Long Wharf*, 5 Pick. 135, 139. The court will take into consideration the situation of the parties, the state of the country, and of the .thing granted, at the time, in order to ascertain the intent of the parties. *Adams* v. *Frothingham*, 3 Mass. 352. *Commonwealth* v. *Roxbury*, ante, 493. *Rider* v. *Thompson*, 23 Maine, 244. A proprietary grant in 1680 of " a piece of land below high water mark, to set a shop upon, not exceeding forty feet in width," extended to low water mark, if within the hundred rods. *Adams* v. *Frothing ham*, 3 Mass. 352. But a grant of a " thatch bank " below high water mark does not pass the flats towards low water mark, upon which no thatch grows. *Lufkin* v. *Haskell*, 3 Pick. 359. A description of flats as bounded on one side upon a way estops the grantor to deny that there is such a way, but is not a covenant against the acts of third persons. *Parker* v. *Smith*, 17 Mass. 413. *Howe* v. *Alger*, 4 Allen, 206.

Among the rights granted to the Massachusetts Company by the Charter were " free libertie of fishing in or within any the rivers or waters within the boundes and lymites aforesaid, and the seas thereunto adjoining; and all fishes, royal fishes, whales, balan, sturgions, and other fishes, of what kinde or nature soever." 1 Mass. Col. Rec. 7, 8 ; Anc. Chart. 5. 2 Dane Ab. 688. 2 Chalmers Opinions, 131. In 1645 an " auditor generall," was appointed, and directed, among other things, to " take notice and looke after wafts, strayes, goods lost, shipwrecks, whales, &c., or any such things of the like nature where the particulai owner is not knowne, and the country may claim a priviledge in or common right unto." 2 Mass. Col. Rec. 143. 3 Mass. Col. Rec. 55. In the Plymouth Colony, drift whales cast ashore, or floating within a mile, belonged to the town ; at sea, beyond those bounds, half to the Colony, and half to the finder. 11 Plym. Col. Rec. 62, 133, 134, 208; Plym. Col. Laws, (ed. 1685) 30 ; (ed. 1836) 97, 133, 135, 282. In Nantucket, rights to drift whales were reserved in deeds from Indian proprietors as early as 1653, and in a patent from James 2 in 1687. Hough's Nantucket Papers, 18 note, 132.

In 1632, the exclusive right of catching fowl upon " Pullen Poynte or Nodles Iland " was granted to John Perkins, and Conant's or Governor's Island, " with all the liberties and privileges of fishing and fowling," to Governor Winthrop. 1 Mass. Col. Rec. 94, 139, 293, 301. In 1634 a grant was made to Israel Stoughton by the general court, confirming a grant from the town of Dorchester in the previous year, of a mill right and a several fishery near the mouth of the Neponset River. 1 Mass. Col. Rec. 114, 128. *Stoughton* v. *Baker*, 4 Mass. 527. *Commonwealth* v. *Alger*, 7 Cush. 99, 100. In June 1641, " it is ordered that a plantation for the furtherance of fishing shall forthwith bee set up at Nantascot, and that all the neck to the furtherest end towardes Hingham where the tide

overfloweth shall belong to it." 1 Mass. Col. Rec. 326. The rights acquired un-der such grants were expressly reserved in the sixteenth article of the Body of Liberties, *ante*, 465 note. In Massachusetts, rivers are deemed navigable so far as the tide ebbs and flows; and above that point the right of fishing is in the riparian proprietor, subject however, like such rights acquired under legislative grant, and all other rights of fishing, either in the sea or in rivers, to regulation by the legislature, so as to prevent the obstruction of the passage of fish, in all cases where previous statutes do not amount to a contract with parties obstruct-ing the river. Sullivan on Land Titles, 285, 286. 2 Dane Ab. 695, 696, 703-707, 710. *Stoughton* v. *Baker*, 4 Mass. 522. *Nickerson* v. *Brackett*, 10 Mass. 212. *Commonwealth* v. *Chapin*, 5 Pick. 199. *Dunham* v. *Lamphere*, 3 Gray, 268. *Commonwealth* v. *Essex Co.* 13 Gray, 247, 248. *Cottrill* v. *Myrick*, 3 Fairf. 229, 230. *Fuller* v. *Spear*, 14 Maine, 418. *Lunt* v. *Hunter*, 16 Maine, 11. *Peables* v. *Hanaford*, 16 Maine, 108. *Preble* v. *Brown*, 47 Maine, 286.

The title to the flats seems to have been deemed before the Revolution to carry with it the right to the shellfish growing thereon. *Ipswich Proprietors* v. *Herrick*, (1772,) *post*, 529. It is true that the special verdict in that case found that the premises had been " possessed and improved " by the plaintiffs for more than twenty years. But the only acts of possession or improvement shown by the evidence, or indeed of which the premises, while uninclosed, were capable, was making annual leases thereof. Mr. Dane says, " By our law, fisheries, taking oysters, digging clams in flats-grounds, &c. are incorporeal hereditaments, that may be appurtenant to lands and territories." " Many parts of our flats-ground, and the rights of sea manure, &c. on them, belong to proprietors in com-mon and undivided." 2 Dane Ab. 690, 697. But he does not seem to have been very clear in his views about taking shellfish, sometimes classing it with " digging sand and sea manure," sometimes with " fishing and fowling," and sometimes with both. 2 Dane Ab. 694, 699, 700, 705.

Long since the Revolution, taking clams on the sea shore was recognized as the subject of a several fishery. *Brown* v. *Lakeman*, 15 Pick. 151. *Lakeman* v. *Butler*, 17 Pick. 436. The first adjudication to the contrary in this common-wealth was in 1849. *Weston* v. *Sampson*, 8 Cush. 351. That case arose in the county of Plymouth, to which the Massachusetts colony ordinances *proprio vigore* did not extend, and where fishing and fowling had been declared to be free from the earliest times. Ordinances 1627–1685, 11 Plym. Col. Rec. 5, 16, 114, 198; Plym. Col. Laws, (ed. 1685) 37; (ed. 1836) 30, 34, 282, 324. Yet the decision was not based upon that distinction, but upon the ground that the public right of fishing, reserved by the colony ordinances, extended to shellfish as well as to swimming fish.

. The same doctrine, upon similar grounds, has been repeatedly declared in Maine. But it seems never to have been necessary to a decision there; for one case was simply of a corporation, building a dam on its own land by au-thority of the legislature, and held not liable for injuries thereby occasioned to clams on the flats below; a second was of an owner of flats, held liable for

taking oysters thereon out of season without license; and a third concerned a shad fishery in a river, above tide water. *Parker* v. *Cutler Milldam*, 20 Maine, 358. *Moulton* v. *Libbey*, 37 Maine, 472. *Preble* v. *Brown*, 47 Maine, 286.

In 1856 this doctrine was applied within the limits of the Massachusetts Colony to the same beach which was in dispute in *Brown* v. *Lakeman* and *Lakeman* v. *Butler*, *ubi supra*, very near the flats trespassed upon in *Ipswich Proprietors* v. *Herrick*, *post*, 529, and notwithstanding evidence of a claim of exclusive right, constantly asserted by sales of licenses and otherwise, running back almost to the time of that decision. *Lakeman* v. *Burnham*, 7 Gray, 437.

Notwithstanding the words of the ordinance of 1641, the public right of fishing is not confined to the inhabitants of the town. *Lakeman* v. *Burnham*, 7 Gray, 437. 2 Dane Ab. 694, 699. The common right of fishery does not authorize the public to fix stakes on flats belonging to the owner of the upland, for the purpose of setting a seine. *Locke* v. *Motley*, 2 Gray, 267. *Duncan* v. *Sylvester*, 24 Maine, 486. But below low water mark any one may use a seine. 2 Dane Ab. 692, 693. The right of taking shellfish does not include any right to take the soil, or dead shellfish imbedded therein, for manure. *Porter* v. *Shehan*, 7 Gray, 435. *Moore* v. *Griffin*, 22 Maine, 350.

Timber cast upon the beach by the sea, and not claimed by any previous owner, belongs to the owner of the beach. *Barker* v. *Bates*, 13 Pick. 255. So does seaweed, thrown upon the shore within the limits of the ordinance of 1647. *Cohasset Proprietors* v. *Tower*, (1821) 24 Law Reporter, 733. *Phillips* v. *Rhodes*, 7 Met. 323. The right to such seaweed depends upon the present extent of the beach, and not upon its condition when the owner acquired his title. *Phillips* v. *Rhodes*, 7 Met. 325. And it cannot be granted away by the legislature. *Cohasset Proprietors v. Tower*, 24 Law Reporter, 734. But, by a recent statute, seaweed adrift, moved by each wave, though touching the beach, may be taken by any one. *St.* 1859, *c.* 247. *Anthony* v. *Gifford*, 2 Allen, 549.

Public landing places exist in some towns by immemorial usage. *Commonwealth* v. *Manning*, 3 Dane Ab. 20. *Kean* v. *Stetson*, 5 Pick. 495. *Coolidge* v. *Learned*, 8 Pick. 511. In the Plymouth Colony, it was ordered in 1627 " that the old path ways be still allowed, and that every man be allowed a convenient way to the water, wheresoever the lot fall." 11 Plym. Col. Rec. 21; Plym. Col. Laws, (ed. 1836), 30. The earliest entry on the existing town records of Boston is an order of September 7th 1634, in Governor Winthrop s handwriting, to prevent obstructions of " the bridge and common landing place," requiring that " whosoever shall unlade any stones, timber or logges, where the same may not be plainly seen at high water, shall set up a pole or beacon to give notice thereof," upon penalty of paying all damages; " this order to bee in force from this daye forward, being onely a declaration of the common lawe herein." 1 Boston Town Rec. 1. Old landing places cannot be discontinued, nor new ones laid out, without authority of the legislature. *Commonwealth* v. *Tucker*, 2 Pick. 47. *Kean* v. *Stetson*, 5 Pick. 495. *Bethum* v. *Turner*, 1 Greenl. 111 *Winslow* v. *Gifford*, 6 Cush. 327. *Bennett* v. *Clemence*, 5 Allen,

On the 6th of March 1633, the general court ordered " that all the swamps conteyneing above one hundred acres, either belonging to any towne or not, shall lye in common for any free inhabitant to fetch wood att seasonable tymes, without prejudice to the inhabitants where the same is, (that swampe onely excepted lyeing within the Newe Towne pale towards the bay.) " 1 Mass. Col. Rec. 111 Whether a custom for all the inhabitants of a town to pick cranberries on a pri vate estate is good, *quære. Barnstable* v. *Thacher,* 3 Met. 245.

Great ponds were not at first reserved as public property, or lying in common. On the 6th of May 1635, " there is 500 acres of land, and a freshe pond, with a little ileland conteyneing aboute two acres, graunted to John Humfry, Esqr. lyeing betwixte nore and west from Saugus," (afterwards Lynn,) which pond now lies in Lynnfield and Danvers, and is still known as Humfrey's Pond. 1 Mass. Col. Rec. 147, 211. Lewis's Hist. Lynn, 52. But the Body of Liberties, art. 16, and the ordinance of 1647, declared the right of fishing and fowling in great ponds to be free; and the latter provided " that no town shall appropriate to any particular person or persons any great pond, containing more than ten acres of land." 28 Mass. Hist. Coll. 219. Mass. Col. Laws, (ed. 1660) 50 ; (ed. 1672) 90, 91 ; Anc. Chart. 148, 149. The question of the effect of the grant to the town of Roxbury in the principal case upon the title to the pond shown on the plan, *ante,* 459, and the right of cutting ice therein, has been recently argued before the supreme judicial court, but not yet decided. *West Roxbury* v. *Stoddard,* 5 Allen. G.